UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NANCY MALDONADO, *as the Administrix of the Estate of Jonathan Maldonado*,

               Plaintiff,

       v.

TOWN OF GREENBURGH, *et al.*,

               Defendants.

No. 18-CV-11077 (KMK)

OPINION & ORDER

---

Appearances:

Debra Sue Cohen, Esq.
Randolph M. McLaughlin, Esq.
Newman Ferrara LLP
New York, NY
*Counsels for Plaintiff*

Thomas J. Troetti, Esq.
Law Offices of Thomas J. Troetti
White Plains, NY
*Counsels for Defendants Police Officer Jean-Paul Lara, Lieutenant Gregory P Attalienti, Police Officer Richard Maguire, and Detective/Paramedic Sean Freeman*

KENNETH M. KARAS, United States District Judge:

      Nancy Maldonado ("Plaintiff") brings this Action, as the Administrix of the Estate of

Jonathan Maldonado ("Maldonado"), against Defendants pursuant to 42 U.S.C. § 1983, the

United States Constitution, and certain state laws.  (*See* Am. Compl. (Dkt. No. 63).)[1]

---

[1] "Defendants" refers collectively to the Town of Greenburgh (the "Town"), Police Officer Richard Maguire ("Maguire"), Police Officer Jean-Paul Lara ("Lara"), Detective/Paramedic Sean Freeman ("Freeman"), and Lieutenant Gregory P. Attalienti ("Attalienti").  (*See* Dkt.; Am. Compl.)  Additionally, the Amended Complaint was originally filed as Docket Number 62, but due to a filing error, was refiled as Docket Number 63.  The Court cites to the pleading filed at Docket Number 63 throughout the Opinion & Order.

Specifically, Plaintiff alleges that Defendants' actions led to Maldonado's death while Maldonado was purportedly held in police custody and brings claims for, inter alia, use of excessive force, deliberate medical indifference, deliberate indifference in supervising subordinate actors, negligence, and wrongful death.  (*See generally id.*)  Before the Court is Moving Defendants' Motion To Dismiss portions of the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion").[2]  (*See* Not. of Mot. (Dkt. No. 86).)  For the following reasons, the Motion is granted in part and denied in part.

## I.  Background

### A.  Factual History

The following facts are drawn from the Amended Complaint, and are taken as true for purposes of resolving the instant Motion.

Maldonado worked as a school aide for the Yonkers Public Schools.  (Am. Compl. ¶ 10.) On November 29, 2017, Maldonado, then 21 years old, finished work at 2:30 p.m. and went to his home, where he lived with his parents and two brothers.  (*Id.* ¶¶ 10–11.)  Maldonado then left his home, telling his mother that he was going to drive his grandmother to Central Avenue to run an errand and that he would be stopping by the bank to deposit his paycheck.  (*Id.* ¶¶ 13–14.) Maldonado left at 4:58 p.m.  (*Id.* ¶ 15.)

At 5:45 p.m., Maldonado exited a store located on Central Avenue in Hartsdale, New York.  (*Id.* ¶ 17.)  As Maldonado left, an alarm at the store went off.  (*Id.* ¶ 18.)  Store employees called 911 to report a suspected shoplifting incident where the shoplifter purportedly took a

---

[2] "Moving Defendants" refers to the individual Defendants, i.e., Maguire, Lara, Attalienti, and Freeman.  The Town has not joined in the instant Motion.  Each of the Moving Defendants is alleged to be a police officer employed by the Town.  (*See* Am. Compl. ¶¶ 6–9.) Freeman is also alleged to be a paramedic.  (*Id.* ¶ 8.)

display model of an iPhone.  (*Id*. ¶¶ 19–20.)  Before police could arrive, store employees

observed and followed customers they suspected to be a shoplifter.  (*Id*. ¶ 21.)  Some employees

followed Maldonado out of the store, across Central Avenue, and into a park, Webb Field.  (*Id*.

¶ 22.)  While Maldonado was walking away from the employees, he lost his balance and fell

down.  (*Id*. ¶ 23.)  The store employees surrounded Maldonado and asked him about the phone,

which Maldonado denied having in his possession.  (*Id*. ¶¶ 24–25.)

One of the employees saw Maguire's police vehicle traveling towards Webb Field on

Central Avenue and flagged him down.  (*Id*. ¶ 26.)  At the same time, Lara and Freeman were en

route to the store in response to the shoplifting call.  (*Id*. ¶ 27.)  Plaintiff alleges that when

Maguire was flagged down, Maldonado was kneeling, bent over on the ground, and not

attempting to flee or physically confront the store employees.  (*Id*. ¶ 28.)  As the police officers

began to approach the scene, store employees observed Maldonado take "what appeared to be

some small envelopes out of a wallet."  (*Id*. ¶ 29.)

As Maguire got out of his police vehicle, some of the store employees notified him that

they believed that Maldonado had put something in his mouth and that it was possibly some type

of drug.  (*Id*. ¶ 31.)  Maguire, the first police officer to arrive on the scene, ran from his vehicle,

jumped on top of Maldonado, and "forcefully" attempted to reach the substance in Maldonado's

mouth.  (*Id*. ¶¶ 30, 32.)  Lara and Freeman arrived at the scene soon afterwards.  (*Id*. ¶ 33.)

Plaintiff alleges that "one or more" of the police officers lifted Maldonado up and

"slammed him to the ground."  (*Id*. ¶ 35.)  Subsequently, Lara tasered Maldonado in "prong

mode" on his back once and then used "stun mode" on his buttock as he was being restrained

face down on the ground by the other officers.  (*Id*. ¶ 36.)  According to Plaintiff, Lara first

deployed the taser "within only 1 to 2 feet away" from Maldonado, which was too close to cause

"neuromuscular incapacitation" and instead could only have caused pain.  (*Id*. ¶¶ 37–39.)
Plaintiff also claims that Lara's second use of the taser, in "stun mode," was also for the purpose
of inflicting pain.  (*Id*. ¶¶ 40–42.)  Plaintiff alleges that Maldonado never fought with the police
officers during this confrontation.  (*Id*. ¶ 44.)

Following the tasering, Maldonado became "limp and unresponsive."  (*Id*. ¶ 45.)
Plaintiff alleges that when Attalienti arrived at the scene, he saw Maldonado on the ground with
his hands behind his back and Lara kneeling beside him.  (*Id*. ¶ 46.)  Attalienti allegedly
observed the other police officers turning Maldonado over and sitting him up.  (*Id*. ¶ 47.)
Attalienti ordered Lara to hold Maldonado up.  (*Id*. ¶ 48.)

Freeman left the scene and the unconscious Maldonado to get "NARCAN."  (*Id*. ¶¶ 50–
51.)  In the meantime, a non-party EMT, Jovan Thompson ("Thompson"), arrived in an
ambulance, in response to a radio call from Lara.  (*Id*. ¶¶ 52–53.)  Following a quick examination
of Maldonado, Thompson told Freeman that he detected only a weak pulse and that Maldonado
needed to be rushed to "necessary medical treatment."  (*Id*. ¶ 54.)  Plaintiff alleges that
Freeman's status as a paramedic, however, gave him "seniority" over Thompson in deciding how
to assist Maldonado.  (*Id*. ¶ 55.)  Instead of immediately transporting Plaintiff to a hospital,
Freeman proceeded to administer multiple doses of NARCAN, a medicine used to counteract
drug overdoses.  (*Id*. ¶ 56.)  Plaintiff alleges that the positive effects of NARCAN are usually
"immediately observable" when a drug overdose is the cause of loss of consciousness.  (*Id*. ¶ 57.)
However, despite being given NARCAN, Maldonado showed no signs of improvement.  (*Id*.
¶ 58.)  Freeman was allegedly able to observe that Maldonado was not breathing, even after
administering the NARCAN.  (*Id*. ¶ 59.)  Plaintiff also alleges that Freeman did not check

Maldonado's airway, provide any "oxygen therapy," or conduct any cardiac intervention. (*Id.* ¶ 60.)

Ten minutes after Maldonado had been tasered, Thompson lifted Maldonado off the ground and placed him on a gurney. (*Id.* ¶ 61.) The gurney was moved to the ambulance but not immediately placed inside. (*Id.* ¶ 62.) Subsequently, a second paramedic, Kenneth Marello ("Marello") arrived at the scene and observed Maldonado being loaded into the back of Thompson's ambulance. (*Id.* ¶ 64.) Marello allegedly noticed that Maldonado was not moving and unresponsive. (*Id.* ¶ 65.) Marello also determined that Maldonado did not have a pulse and was not breathing. (*Id.* ¶ 66.)

Plaintiff alleges that once Marello arrived on the scene, CPR was performed, and "potentially life-saving drugs, including epinephrine," were administered on Maldonado. (*Id.* ¶ 67.) At this point, Freeman also took steps to "visualize" Maldonado's airway and insert an endotracheal tube. (*Id.* ¶ 68.) Freeman observed five small intact plastic-like bags inside Maldonado's mouth, which he removed with forceps. (*Id.* ¶ 69.) Even after Marello's arrival, Maldonado continued to be administered NARCAN. (*Id.* ¶ 73.)

The ambulance transported Maldonado to White Plains Hospital over 20 minutes after Maldonado had been tasered. (*Id.* ¶ 75.) Thompson drove the ambulance, while Marello and Freeman rode in the back with Maldonado, and Lara escorted the ambulance. (*Id.* ¶¶ 76–77.) Plaintiff alleges that once they arrived at the hospital, Lara and Freeman provided the hospital with "false information" regarding the events leading up to Maldonado's loss of consciousness. (*Id.* ¶ 78.)

Maldonado was declared dead at the hospital at 6:54 p.m. (*Id.* ¶ 79.) On December 2, 2017, Attalienti filed an incident report that allegedly contained "false and misleading

information." (*Id*. ¶ 81.)  The report stated that Maguire had used physical force against Maldonado when he arrived at the scene because Maldonado was fighting with the store employees.  (*Id*. ¶ 82.)  Plaintiff disputes this, as she alleges that Maldonado never fought with either the store employees or the police officers throughout the entire encounter.  (*Id*. ¶¶ 28, 44.)

Based on the above facts, Plaintiff seeks compensatory and punitive damages pursuant to 42 U.S.C § 1983 and state law.  (*See id*. ¶ 84.)

B.  Procedural History

On November 28, 2018, Plaintiff filed the original Complaint against Defendants.  (*See* Compl. (Dkt. No. 1).)  On December 14, 2018 and January 30, 2019, Defendants filed Answers to the Complaint.  (*See* Moving Defs.' Answer to Compl. (Dkt. No. 33); *see also* Town's Answer to Compl.; Morello & Thompson's Answer to Compl. (Dkt. Nos. 36–37).)  A Case Management and Scheduling Order was adopted on June 18, 2019.  (*See* Case Management & Scheduling Order (Dkt. No. 45).)

On August 14, 2019, counsel for Thompson and Morello filed a Pre-Motion Letter requesting leave of the Court to file a motion to dismiss the Complaint.  (Dkt. No. 50.)  On August 19, 2019, counsel for Moving Defendants joined in the request to file a "pre-answer motion to dismiss" on behalf of Defendant Freeman.  (Dkt. No. 55.)[3]  On August 23, 2019, Plaintiff responded to the arguments asserted in both Letters and requested an opportunity to amend her Complaint, (Dkt. No. 59), which the Court granted, (Dkt. No. 60).  The Court

---

[3] Thompson, Morello, and Moving Defendants had already Answered the original Complaint, so it is unclear why counsel requested leave to file a "pre-answer" motion to dismiss instead of a motion for judgment on the pleadings at that point in the Action.  (*See* Moving Defs.' Answer to Compl.; Morello & Thompson's Answer to Compl.)  However, no Defendant has answered the Amended Complaint, yet.

instructed Defendants to either file an answer or a supplemental pre-motion letter in response to the amended complaint.  (*See id.*)

Plaintiff filed the Amended Complaint on September 24, 2019.  (*See* Am. Compl.)[4]  On October 13, 2019, counsel for Moving Defendants filed a Pre-Motion Letter seeking leave of the Court to file a motion seeking dismissal of the Amended Complaint against Defendant Freeman in particular.  (Dkt. No. 67.)  On October 15, 2019, the Town also submitted a Pre-Motion Letter seeking to file a "pre-answer motion to dismiss."  (Dkt. No. 68.)  On November 12, 2019, the Court held a Pre-Motion Conference on the putative motions and adopted a briefing schedule. (*See* Scheduling Order (Dkt. No. 76).)

On January 13, 2020, counsel for Moving Defendants attempted to file opening papers but encountered a filing error.  (Dkt. No. 84.)  On February 6, 2020, Moving Defendants correctly filed their operative opening papers.  (*See* Not. of Mot.; Moving Defs.' Mem. of Law in Supp. of Mot. ("Moving Defs.' Mem.") (Dkt. No. 88).)[5]  On February 17, 2020, Plaintiff filed an Opposition.  (*See* Pl.'s Mem. of Law in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 91).)  On March 4, 2020, Moving Defendants filed their Reply.  (*See* Moving Defs.' Reply Mem. of Law in Supp. of Mot. ("Moving Defs.' Reply Mem.") (Dkt. No. 97).)[6]

---

[4] The Amended Complaint appeared to allege claims of medical negligence and/or deliberate indifference as to Freeman but no longer directed those claims towards Morello or Thompson, who were terminated from this Action.  (*See* Dkt.; Am. Compl.)

[5] Despite granting leave to file this Motion on the basis of a Pre-Motion Letter that sought dismissal of certain claims as to Defendant Freeman *only*, (*see* Dkt. No. 67), counsel for Moving Defendants has also included arguments seeking dismissal of other individual Defendants in the instant Motion.  The Court will address these arguments as needed because they were briefed and because Plaintiff has submitted counterarguments, but these arguments should have been raised in the Pre-Motion Letter.

[6] Despite filing a Pre-Motion Letter, it appears that the Town did not file any independent memorandum and does not join the instant Motion.  (*See* Not. of Mot.; *see generally* Dkt.)

<u>II.  Discussion</u>

A.  <u>Standard of Review</u>

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but

it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[ ] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Further, in adjudicating a Rule 12(b)(6) motion, a court may consider the pleadings, their exhibits, statements or documents incorporated by reference in the pleadings, "any matter of which [the court] can take judicial notice," and documents "integral" to the complaint.  *120 Greenwich Dev. Assocs., LLC v. Admiral Indem. Co.*, No. 08-CV-6491, 2013 WL 12331487, at *4 (S.D.N.Y. Sept. 25, 2013) (alterations and quotation marks omitted) (collecting cases).

   B.  Analysis

      1.  Application of the Fourth and Fourteenth Amendments

Moving Defendants appear to argue that, once Maldonado became "limp and unresponsive," (Am. Compl. ¶ 45), physical custody was for medical—and not for law enforcement—purposes and that, accordingly, Freeman cannot be held to the standards of care that protect arrestees or pretrial detainees pursuant to the Fourth and Fourteenth Amendment, (Moving Defs.' Mem. 7–13).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. Amend. IV.  The Fourth Amendment is not triggered unless a search or seizure has occurred, and "the antecedent question whether or not a Fourth Amendment

'search' [or seizure] has occurred is not so simple under [the Supreme Court's] precedent."
*See Kyllo v. United States*, 533 U.S. 27, 31 (2001); *see also Hearring v. Sliwowski*, 712 F.3d 275,
281 (6th Cir. 2013) ("[T]he Fourth Amendment's protections are not triggered until a search
occurs." (citations omitted)).  Generally speaking, the Fourth Amendment's protections apply
when the "objectionable conduct occurred [in the context] of a criminal investigation or other
form of governmental investigation or activity."  *See Poe v. Leonard*, 282 F.3d 123, 136 (2d Cir.
2002).  Thus, the *purpose* of the search or seizure dictates whether it is considered a search
or seizure under the Fourth Amendment.  Moreover, the "Due Process Clause . . . require[s] the
responsible government or governmental agency to provide medical care to persons . . . who
have been injured while being apprehended by the police."  *City of Revere v. Mass. Gen. Hosp.*,
463 U.S. 239, 244 (1983); *accord Cruz v. City of New Rochelle*, No. 13-CV-4732, 2017 WL
1402122, at *28 (S.D.N.Y. Apr. 3, 2017).  Generally, "[a]n arresting officer discharges that
'constitutional obligation by seeing that the arrestee is taken promptly to a hospital that provides
the treatment necessary for the injury'" or "otherwise receive[s] adequate medical care."  *Garcia
v. Dutchess County*, 43 F. Supp. 3d 281, 300 (S.D.N.Y. 2014) (alterations omitted) (quoting *City
of Revere*, 436 U.S. at 245), *aff'd in part, dismissed in part sub nom. Garcia v. Sistarenik*, 603 F.
App'x 61 (2d Cir. 2015).

Moving Defendants argue that the Amended Complaint demonstrates that Maldonado
was in custody for medical purposes only.  However, the allegations at least raise plausible
inferences that Maldonado was in custody for law enforcement purposes.  For example, the
Amended Complaint alleges that, while responding to a report of shoplifting at a store, police
officer Maguire was flagged down by that very store's employees, who had surrounded
Maldonado as a suspect.  (*See* Am. Compl. ¶¶ 19–26.)  Subsequently, the store employees

informed Maguire that they had seen Maldonado ingest some plastic envelopes, at which point Maguire jumped on top of Maldonado and attempted to grab the ingested substances. (*See id*. ¶¶ 29–32.) Both Freeman and Lara, who are also alleged to be police officers responding to the shoplifting incident, arrived at the scene at around the same time that Maguire began to physically confront Maldonado. (*See id*. ¶ 33.) At some point during this confrontation, Maldonado was handcuffed. (*See id*. ¶ 61.)

The alleged circumstances are a far cry from the facts of the cases cited by Moving Defendants in support of its argument that Maldonado's detainment was for medical purposes only and therefore not eligible for Fourth Amendment protections. For example, in *Masciotta v. Clarkstown Central School District*, 136 F. Supp. 3d 527 (S.D.N.Y. 2015), the plaintiff, a student at a public high school, was inspected by a school nurse because the school nurse was concerned that the plaintiff was engaging in self-harming behavior. *See id.* at 531–32. There, this Court concluded that the defendants were protected by qualified immunity when conducting the searches at issues because "it was not clearly established that [the d]efendants' actions were even covered by the Fourth Amendment." *Id*. at 539. The Court also cited to a number of cases that described similar contexts, such as other searches conducted by school nurses, medical tests of an infant at a hospital, and other "*non-criminal* and *non-investigatory* searches done for medical purposes." *Id*. at 538–40 (emphases added) (citation and footnote omitted). Additionally, in *Peete v. Metropolitan Government of Nashville and Davidson County*, 486 F.3d 217 (6th Cir. 2007), another case cited by Moving Defendants, the paramedics at issue were "coming to the aid of an unconscious individual as a result of a 911 call by a family member." *Id.* at 220. Indeed, in that opinion, the Sixth Circuit specifically differentiated those facts from the "vast

majority of . . . Fourth Amendment cases," where "courts analyze the conduct of police officers towards persons they have arrested or otherwise detained." *Id.* (collecting cases).[7]

Here, by contrast, the medical conditions that required treatment—Maldonado's lack of consciousness and inability to breath—are alleged to be a direct result of the arrest or detainment initiated *by* police officers Maguire, Lara, and Freeman.  Given that the police officers were allegedly responding to reports of shoplifting and were informed by the store employees that Maldonado had potentially possessed and ingested an illicit substance, the Amended Complaint plausibly alleges that Maldonado was in custody as a suspect, not as an individual experiencing a medical emergency.  Indeed, Maldonado was allegedly handcuffed, (*see* Am. Compl. ¶ 61), and "[h]andcuffs are generally recognized as a hallmark of a formal arrest," *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) (collecting cases).  The facts that Maguire tackled Maldonado and that the other police officers proceeded to restrain and taser him allow for the plausible inference that, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that [Maldonado] was not free to leave." *Kia P. v. McIntyre*, 235 F.3d 749, 762 (2d Cir. 2000) (citation and quotation marks omitted).  Therefore, all the circumstances leading up to Maldonado's "limp and unresponsive state," (Am. Compl. ¶ 45), plausibly stem from the officers' intent to investigate and/or detain Maldonado in connection with suspicions of

---

[7] *Estate of Hill by Hill v. Miracle*, 853 F.3d 306 (6th Cir. 2017), is similarly inapplicable because there, the paramedics and law enforcement officers responded to a 911 call seeking medical assistance for a diabetic emergency. *Id.* at 310.  A police officer deployed his taser when the disoriented decedent "swung a fist" and attempted to kick the paramedics who were trying to restrain him and insert a catheter. *Id.* at 310–11.  Unlike the circumstances here, which originated with a 911 call regarding a shoplifting incident, law enforcement in *Hill* was responding to what was undisputedly a *medical* call. *Id.* at 310.

shoplifting and/or drug possession.[8]  The alleged medical emergency arose *while* the police

officers were apprehending Maldonado for those criminal acts, and contact was not alleged to

have initiated because of a medical call.

It is true that Freeman, a police officer who also happened to be a certified paramedic,

then had the opportunity and ability to administer medical care, but that alone does not mean that

Maldonado's Fourth Amendment *right* to adequate medical care pursuant to a potential arrest or

detainment evaporated.  Moving Defendants cite to no case that divides the applicability of the

Fourth Amendment's protections between before and after a detainee's injury.  (*See* Moving

Defs.' Mem. 9.)  Nor do they cite a case that stands for the proposition that a law enforcement

officer who is also certified to provide medical assistance is immune from Fourth Amendment

liability, particularly when that officer participated in the arrest or detainment that is alleged to

have *caused* the medical emergency at issue.  (*Id.* at 11.)  Indeed, doing so could potentially

severely limit the constitutional responsibility that government actors bear to "provide medical

care to persons . . . who have been injured while being apprehended by the police."  *City of*

*Revere*, 463 U.S. at 244.[9]

---

[8] Of course, another inference—that the police officers jumped on, restrained, and tasered Maldonado to prevent a potential drug overdose—may also be *plausible*.  But to survive a motion to dismiss, a plaintiff need not allege facts that can exclusively be interpreted in only *one* way.  Plaintiff only needs to raise a plausible inference that Maldonado was being detained for investigative purposes as contemplated by the Fourth Amendment's protections, which she has. "[I]t is not the district court's province to dismiss a plausible complaint because it is not as plausible as the defendant's theory.  The test is whether the complaint is plausible, not whether it is less plausible than an alternative explanation."  *Palin v. N.Y. Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019) (footnote omitted); *see also Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement[]' . . . ." (citation omitted)).

[9] Although Moving Defendants argue that "strong policy considerations" counsel against holding a "medical provider [who] also happens to be employed as a police officer" liable under the Fourth Amendment, (Moving Defs.' Mem. 12), there are also strong policy considerations

Accordingly, the Court finds that the allegations are sufficient to suggest that Freeman

may plausibly be found liable to Plaintiff under the Fourth Amendment, and that the type of

qualified immunity applied in *Masciotta*, 136 F. Supp. 3d 527, does not apply.  *See Garcia*, 43 F.

Supp. 3d at 285, 290, 300–01 (noting that the Fourth Amendment and Due Process Clause

applied and denying summary judgment where police officers were alleged to have tasered the

decedent and delayed medical care in a confrontation that arose from a 911 call alerting the

police officers that the decedent may have been under the influence of cocaine); *see also*

*Graham v. Connor*, 490 U.S. 386, 389, 394 (1989) (noting that Fourth Amendment protections

applied where police officers approached an individual after seeing him "hastily enter and leave

[a] store," handcuffed him, and observed him lose consciousness); *Salmon v. Blesser*, 802 F.3d

249, 254–55 (2d Cir. 2015) (explaining that a Fourth Amendment seizure claim is plausibly

alleged where the officers purportedly used "painful force" to control an individual's

movements); *United States v. Levy*, 217 F. Supp. 3d 643, 657 (E.D.N.Y. 2016) (explaining that a

Fourth Amendment seizure occurs where a police officer restrains a citizen "by means of

physical force or show of authority" (citation and quotation marks omitted)).

## 2.  Deliberate Medical Indifference Claim

Moving Defendants also seek dismissal of Plaintiff's second count, which the Court

interprets as a claim for deliberate medical indifference under the Fourteenth Amendment.

(Moving Defs.' Mem. 13; Am. Compl. ¶¶ 90–92.)

Because Plaintiff was a pre-trial detainee at the time he was allegedly denied adequate

medical care, Plaintiff's claim falls under "the Due Process Clause of the Fourteenth

Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h]

---

counseling against *not* holding police officers who happen to have medical training liable for
injuries that they are alleged to have caused during an arrest or detainment.

Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citation omitted).  A pre-trial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner."  *Id.* (quotation marks omitted) (quoting *City of Revere*, 463 U.S. at 244).

To establish a claim for deliberate indifference to medical needs under the Due Process Clause of the Fourteenth Amendment, a pre-trial detainee must establish two elements: (1) that the "deprivation of medical care . . . [was] 'sufficiently serious,'" and (2) that the defendant "acted or failed to act with 'a sufficiently culpable state of mind.'"  *Smith v. Outlaw*, No. 15-CV-9961, 2017 WL 4417699, at *2 (S.D.N.Y. Sept. 30, 2017) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)).  The first element is objective in nature and requires allegations that suggest that the detainee was subject to "conditions posing a substantial risk of serious harm."  *Blandon v. Capra*, No. 17-CV-65, 2017 WL 5624276, at *7 (S.D.N.Y. Nov. 20, 2017) (quotation marks omitted) (quoting *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996)).  The second element, which is applied somewhat "differently to claims under the Eighth Amendment [than] the Fourteenth Amendment," also imposes an objective standard, whereas the Eighth Amendment imposes a "subjective standard."  *Howard v. Brown*, No. 15-CV-9930, 2018 WL 3611986, at *4 (S.D.N.Y. July 26, 2018) (citation omitted).  That is, the law enforcement or prison official need only "recklessly fail[] to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety."  *Darnell*, 849 F.3d at 35.

Moving Defendants argue that Freeman's decision to administer NARCAN instead of other "potentially life-saving drugs" or other forms of treatment, such as "oxygen therapy or cardiac intervention," (Am. Compl. ¶¶ 56–59, 60, 67), allege nothing more than negligence,

which is not enough to state a claim for deliberate indifference, *Tutora v. Correct Care Sols., LLC*, No. 17-CV-9169, 2019 WL 1383646, at *5–6 (S.D.N.Y. Mar. 27, 2019) (noting that "the ultimate decision of whether or not to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference" and that "mere negligence will not suffice to state a claim of deliberate indifference" (citations, alteration, and quotation marks omitted)).  Moving Defendants also argue that, in any event, Freeman would be entitled to qualified immunity, given that Lara had already summoned additional medical assistance.  (*See* Moving Defs.' Mem. 13–15.)

Because Moving Defendants have not challenged the seriousness of the alleged deprivation of medical care, the Court assumes the first prong of the deliberate indifference claim was properly pled.  Even if Moving Defendants had challenged it, given that the Amended Complaint alleges that Maldonado was unconscious, not breathing, and ultimately died, Plaintiff has plausibly alleged "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (citation and quotation marks omitted).

Based on the pleadings alone, the Court cannot conclude that Plaintiff has failed to plausibly allege that Freeman (or any other individual Defendant) "recklessly failed to act with reasonable care . . . even though the defendant . . . knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.  Plaintiff has alleged that Freeman ignored non-party EMT Thompson's recommendation that Maldonado be rushed to medical treatment immediately, (Am. Compl. ¶¶ 54–55), that Freeman—who has some medical training—should have known that NARCAN, which typically has an immediate ameliorative effect, was not working on Maldonado, (*id*. ¶¶ 56–59), and that Freeman did not take certain basic steps to assist Maldonado despite noticing that he was unconscious and not

breathing, (*id*. ¶¶ 60–62).  Plaintiff also alleges that there were unnecessary delays in providing

"potentially life-saving" treatments to Maldonado and that those treatments only occurred once

non-party EMT Marello arrived on the scene.  (*See id*. ¶¶ 62–68.)  Plaintiff's allegations

plausibly imply that Freeman should have known better than to delay non-NARCAN treatment

on Maldonado, whose injuries appeared to be critical.  Furthermore, given that Plaintiff alleges

that Maguire fabricated information regarding Maldonado's pre-detainment behavior, (*id*. ¶ 82),

Plaintiff also plausibly implies that Freeman's delay or hesitation in treatment was part of a

larger cover up conducted by Moving Defendants.  These allegations, when read together,

plausibly suggest that Freeman recklessly made critical decisions that, under the circumstances,

led to Maldonado's death, which states a plausible claim for "conscious disregard of a substantial

risk of serious harm."  *Chance*, 147 F.3d at 703 (citation and quotation marks omitted).

Moving Defendants are also not necessarily shielded by qualified immunity simply

because they called for additional medical assistance at some point.  "[A] delay in providing

necessary medical care may in some cases constitute deliberate indifference" in the Second

Circuit.  *Jones v. Westchester County*, 182 F. Supp. 3d 134, 155 (S.D.N.Y. 2016) (citation and

quotation marks omitted).  Although in many cases, calling for medical assistance within an hour

or so of the injury may have sufficed in meeting an official's duties, *see Pateman v. City of White

Plains*, No. 17-CV-6156, 2020 WL 1497054, at *21 (S.D.N.Y. Mar. 25, 2020) (collecting cases),

the Second Circuit has also noted that "it's the particular risk of harm faced by a [detainee] due

to the challenged deprivation of care" that is relevant to deliberate indifference claims, *Smith v.

Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003) (citation omitted).[10]  Therefore, "delay in medical

---

[10] Although *Smith* discusses an Eighth Amendment deliberate indifference claim, its
analysis is still informative because "[a] pre[]trial detainee's rights are *at least as great* as the

treatment must be interpreted in the context of the seriousness of the medical need, deciding

whether the delay worsened the medical condition, and considering the reason for the delay." *Id*.

at 186 (citation and quotation marks omitted).  These factors are simply too fact-intensive in the

alleged circumstances to rule as a matter of law that qualified immunity applies to protect

Defendants.  *See id*. at 187 ("Just as the relevant 'medical need' can only be identified in relation

to the specific factual context of each case, the severity of the alleged denial of medical care

should be analyzed with regard to all relevant facts and circumstances." (citation omitted)).

Therefore, unlike situations where the alleged injuries are not "so urgent or life-threatening that

they required immediate care," *Rodriguez v. Mercado*, No. 00-CV-8588, 2002 WL 1997885, at

*8 (S.D.N.Y. Aug. 28, 2002), the injuries and circumstances complained of here might have

required Freeman and the others to take different or more immediate action.[11]

    Therefore, the Court declines to dismiss any deliberate indifference claim against

Freeman at this early stage of the Action.  *See Case v. Anderson*, No. 16-CV-983, 2017 WL

3701863, at *18 (S.D.N.Y. Aug. 25, 2017) ("Plaintiff has made sufficient allegations of

deliberate indifference to [Maldonado's] serious medical needs, and, based on those allegations,

the Court will infer at this stage that [Freeman] did not 'make reasonable but mistaken

judgments,' but instead made reckless decisions in violation of" Maldonado's rights. (citation

omitted)); *Morgan v. County of Nassau*, 720 F. Supp. 2d 229, 239 (E.D.N.Y. 2010) ("[T]he

Court finds that, taking the [Amended C]omplaint in the best light for . . . [P]laintiff, there is a

---

Eighth Amendment protections available to a convicted prisoner" in this context.  *Pateman*, 2020
WL 1497054, at *19 (emphasis added) (citation and quotation marks omitted).

    [11] Moreover, Plaintiff alleges that even after additional medical assistance—in the form
of EMTs Thompson and Marello—arrived, Freeman delayed Maldonado's transport to the
hospital, despite Thompson's suggestions.  (Am. Compl. ¶¶ 54–55, 62.)  Therefore, the potential
benefit of Lara's call for medical assistance was thwarted by subsequent actions and decisions
that Freeman (and perhaps other Moving Defendants) allegedly made.

plausible claim that [Freeman] was aware of . . . [P]laintiff's medical condition, and was deliberately indifferent to a potentially serious condition.").  For similar reasons, the Court also cannot conclude that qualified immunity applies to Freeman, because "[w]hether [Freeman's] conduct was objectively reasonable in light of" his knowledge that Lara had tasered Maldonado at close distance, his medical knowledge, and Maldonado's unconscious state "turns on disputed questions of fact."  *Lara-Grimaldi v. County of Putman*, No. 17-CV-622, 2018 WL 1626348, at *10 (S.D.N.Y. Mar. 29, 2018) (citation and quotation marks omitted) (collecting cases and declining to grant qualified immunity for defendants on a deliberate indifference claim at the pleading stage).

### 3.  Attalienti's Personal Involvement

Next, Moving Defendants argue that Plaintiff has not plausibly alleged that Attalienti was personally involved in any constitutional violation.  (Moving Defs.' Mem. 16–19.)

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).  To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (citations and alterations omitted).  In other words, "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at

19

676. Therefore, Plaintiff must plausibly allege that Attalienti's actions fall into one of the five categories identified above. *See Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[ ] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*). Plaintiff has alleged that Attalienti is liable as a supervising officer. (Am. Compl. ¶¶ 88, 98–103.) Such a claim requires plausible allegations of the supervising officer's "(1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753 (2d Cir. 2003) (citation omitted).

Plaintiff alleges that when Attalienti arrived at Webb Field, he saw Maldonado on the ground with his hands behind his back, and Lara kneeling beside him. (Am. Compl. ¶ 46.) As Attalienti walked up, the other individual Defendants were turning Maldonado over and sitting him upright. (*Id.* ¶ 47.) Attalienti ordered Lara to hold Maldonado up. (*Id.* ¶ 48.) Attalienti is also alleged to have filed an incident report that contained false information, i.e., that Maguire had observed Maldonado fighting with store employees when Maguire arrived at Webb Field. (*Id.* ¶¶ 81–82.) Plaintiff claims that Attalienti observed Maldonado "while he was being injured and denied medical attention, yet failed to intervene and/or provide and/or request adequate and timely medical attention for . . . Maldonado." (*Id.* ¶ 88.)

It is true that, given the alleged timeline, Attalienti was not present for the alleged use of excessive force that occurred prior to his arrival. Maguire and/or other individual Defendants had already physically restrained and "slammed" Maldonado on the ground, and Lara had

already tasered Maldonado twice by the time Attalienti is alleged to have arrived on the scene.
(*See id.* ¶¶ 33–45.)  Although Plaintiff argues in her Opposition that it is plausible that Attalienti
observed what happened as he approached Maldonado and the other individual Defendants on
Webb Field, she has failed to allege such facts in the Amended Complaint.  (*See* Pl.'s Mem.
19.)[12]  Accordingly, the Amended Complaint fails to allege that Attalienti was "present" for the
alleged use of excessive force "or in any position to have prevented or mitigated" the initial
alleged assault on Maldonado.  *Smith v. Dinoia*, No. 19-CV-4471, 2020 WL 1189492, at *5
(S.D.N.Y. Mar. 12, 2020) (citations omitted) (noting that one defendant was not liable for an
alleged assault where the defendant was alleged to have appeared after the assault occurred);
*Waller v. DuBois*, No. 16-CV-6697, 2019 WL 1434576, at *8 (S.D.N.Y. Mar. 29, 2019) (noting
that certain individual defendants could not be held liable for injuries which they were not
alleged to have "directly participated in . . . or otherwise directly permitted" (citation omitted)),
*appeal dismissed*, No. 09-1921, 2020 WL 2107919 (2d Cir. Jan. 29, 2020).

　　　Although the Court limits the scope of Attalienti's liability, the Court does not agree with
Moving Defendants that Attalienti should be terminated from the Action entirely.  Attalienti's
personal involvement is plausibly alleged as to everything that occurred after his arrival—i.e.,
the deliberate indifference to Maldonado's medical needs once he became limp and unresponsive
and the false incident report that was filed regarding the circumstances surrounding Maldonado's
arrest.  (*See* Am. Compl. ¶¶ 47–48, 81–82, 88.)  Starting from the moment when Attalienti
allegedly arrived at the scene, "Plaintiff has, therefore, not simply alleged that [he] was a

---

[12] Given that Plaintiff is counseled, "[a]llegations made outside of the [Amended C]omplaint are not properly before the [C]ourt" on a motion to dismiss.  *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 79 (D. Conn. 1994) (citation omitted); *see also Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 500 (S.D.N.Y. 2015) ("It is axiomatic that the [Amended] Complaint cannot be amended by the briefs in opposition to a motion to dismiss." (citation, alteration, and quotation marks omitted)).

supervisor—but that [he] was present at the scene and directly involved in the investigation and report[] that Plaintiff alleges were falsified." *Haughey v. County of Putnam*, No. 18-CV-2861, 2020 WL 1503513, at *6 (S.D.N.Y. Mar. 29, 2020) (citations omitted); *see also D.K. by L.K. v. Teams*, 260 F. Supp. 3d 334, 360 (S.D.N.Y. 2017) (finding a defendant's involvement to be plausibly alleged where he was alleged to have "known of abuse . . . but to have covered it up" (record citation, alteration, and quotation marks omitted)); *Arbuckle v. City of New York*, No. 14-CV-10248, 2016 WL 5793741, at *12 (S.D.N.Y. Sept. 30, 2016) (holding that personal involvement was plausibly alleged as to officers who "assisted" in the arrest or "filled out the arrest paperwork" (citation and record citations omitted)).[13]

### 4. State Law Claims

Plaintiff asserts state law claims of, inter alia, negligence and wrongful death in the Amended Complaint. (*See* Am. Compl. ¶¶ 113–23.) Moving Defendants appear to present three separate arguments attacking the sufficiency of these state law claims. Specifically, they argue that Freeman is eligible for immunity from tort claims because he was performing a governmental function, (Moving Defs.' Mem. 20–22), that any state-based negligence or wrongful death claims would be "subsumed under the other federal causes of action," (*id*. at 22–24), and that Plaintiff's wrongful death claim fails because Plaintiff failed to plausibly allege the existence of any distributees who have suffered pecuniary loss as a result of Maldonado's death, (*id*. at 24).

---

[13] Given that the Court has declined to grant Freeman qualified immunity for the deliberate indifference claim at this stage in the Action, it similarly does not grant qualified immunity to Attalienti at this point. (*See* Moving Defs.' Mem. 19–20.)

a.  Governmental Function Immunity

Under New York Law, "[w]hen a negligence claim is asserted against a municipality or its employees, the threshold inquiry is 'whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose.'"  *Velez v. City of New York*, 730 F.3d 128, 134 (2d Cir. 2013) (quoting *Applewhite v. Accuhealth, Inc.*, 995 N.E.2d 131, 134 (N.Y. 2013)).  A municipality or individual performs a governmental function when its acts are "undertaken for the protection and safety of the public pursuant to the general police powers."  *Sebastian v. State of New York*, 720 N.E.2d 878, 879 (N.Y. 1999) (citation and quotation marks omitted).  "Publicly-employed, front-line EMTs and other first responders, who routinely place their own safety and lives in peril in order to rescue others, surely fulfill a government function."  *McKenzie v. City of Mount Vernon*, No. 18-CV-603, 2018 WL 6831157, at *8 (S.D.N.Y. Dec. 28, 2018) (citation, alteration, and quotation marks omitted).

"If it is determined that a municipality was exercising a governmental function, the next inquiry focuses on the extent to which the municipality owed a 'special duty' to the injured party."  *Applewhite*, 995 N.E.2d at 135.  A special duty can arise in three ways:

> (1) when the municipality violates a statutory duty enacted for the benefit of a particular class of persons; (2) when it voluntarily assumes a duty that generates justifiable reliance by the person who benefits from the duty; or (3) when the municipality assumes positive direction and control in the face of a known, blatant[,] and dangerous safety violation.

*Metz v. State of New York*, 982 N.E.2d 76, 79 (N.Y. 2012) (citation and quotation marks omitted).

The second category of special duty is also known as a "special relationship," and it arises when four elements exist:

> (1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on

the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking.

*Applewhite*, 995 N.E.2d at 138 (quotation marks omitted) (ultimately quoting *Cuffy v. City of New York*, 505 N.E.2d 937, 940 (N.Y. 1987)). "Although the issue of whether a special relationship exists is generally a question for the jury, 'courts have granted Rule 12(b)(6) motions where the plaintiff fails to allege or provide the factual predicate for a special relationship in the complaint.'" *McKenzie*, 2018 WL 6831157, at *9 (citation omitted).

Here, Plaintiff has plausibly alleged facts that suggest that a special duty existed, namely that Freeman's actions created a special relationship with Maldonado that went above and beyond the general duty he owed to the public as a police officer and first responder. Here, Freeman is alleged to have been part of the group of police officer Defendants who initially apprehended and allegedly incapacitated Maldonado pursuant to what could be interpreted as an investigative stop, thereby creating direct contact with Maldonado and bringing him within state custody. "[I]t is well-established in New York that when the State assumes physical custody of inmates or detainees, who cannot protect and defend themselves in the same way as those at liberty can, the State owes a duty of care to safeguard those individuals from harm." *Case*, 2017 WL 3701863, at *23 (alterations and quotation marks omitted) (collecting cases); *see also Cuffy*, 505 N.E.2d at 940 ("[A]t the heart of . . . 'special duty' cases is the unfairness that the courts have perceived in precluding recovery when a municipality's voluntary undertaking has lulled the injured party into a false sense of security and has thereby induced him either to relax his own vigilance or to forego other available avenues of protection." (collecting cases)). Freeman is also alleged to have known or reasonably could have known that inaction could result in serious injury or death. And given that Maldonado was detained by the police and unconscious

24

at the time of Freeman's purported negligence, Plaintiff has also plausibly alleged that

Maldonado justifiably relied on the police officers' implicit promise to protect him from harm—

indeed, Maldonado had no choice.  *See Torres v. City of New York*, No. 09-CV-9357, 2017 WL

2191601, at *3–4 (S.D.N.Y. May 17, 2017) (explaining that a special relationship may have been

created where the decedent allegedly contracted meningitis during pretrial confinement, during

which the decedent was "induced to forego other available avenues of protection," and the

plaintiff "presented evidence such that a reasonable fact finder could conclude that" the

municipality "knew or should have known" of the dangerous conditions (citations and quotation

marks omitted)); *Applewhite*, 995 N.E.2d at 133, 138–39 (explaining that a special relationship

may have been created where the EMTs, despite a mother's request to transport her daughter to

the hospital, continued conducting CPR on the daughter, because the EMTs may have "lulled

[the] plaintiffs into a false sense of security" (citation and quotation marks omitted)); *Lynch v.

Town of Greenburgh*, 83 N.Y.S.3d 818, 826 (Sup. Ct. 2018) (noting that "a question of fact

exist[ed]" as to whether a special duty applied where, despite the urgency of decedent's actions

and gestures, "first responders' affirmative actions" may have led to delay in transporting the

decedent to the hospital); *Lewis v. City of New York*, 859 N.Y.S.2d 904 (Table), 2008 WL

787243, at *1–4, *18–19 (Sup. Ct. 2008) (finding that special relationship may have existed

where police officers monitoring a parade recklessly attempted to clear traffic at a crowded

intersection, resulting in a fatal car accident).

    Because Plaintiff has alleged facts that may plausibly suggest that a special relationship

arose between Freeman (and perhaps other Moving Defendants) and Maldonado, the Court

declines to dismiss Plaintiff's negligence claim on the basis of governmental immunity at this

early stage of the litigation.  *See Case*, 2017 WL 3701863, at *23 (explaining that the

applicability of a special duty could not be ruled on as a matter of law because it "turn[ed] on questions of fact which are not appropriately determined at the motion to dismiss stage" (citation and footnote omitted)); *Villar v. Howard*, 64 N.E.3d 280, 283 (N.Y. 2016) (explaining that the defense of governmental immunity is an "affirmative defense on which [the defendant] bears the burden of proof" and is generally inappropriate to resolve at the pleading stage of the proceedings (citation omitted)).

### b.  Sufficiency of Pleadings

Moving Defendants appear to argue that the negligence claim should be dismissed because Plaintiff has also alleged, pursuant to the federal claims, that Moving Defendants used excessive force and were recklessly indifferent to Maldonado's medical needs.  (Moving Defs.' Mem. 22–24.)  To begin, the Amended Complaint may be read as asserting a claim of use of excessive force based on Moving Defendants' actions in restraining and tasering Maldonado while asserting negligence as to the subsequent inadequate medical care that failed to mitigate the medical consequences of the use of force.  (*See* Am. Compl. ¶¶ 32–45, 55–79.)  Therefore, the two different legal standards may be compatible simply because they refer to different conduct in a sequence of actions and which may have involved different levels of intent and culpability.

On the other hand, it is true that some inherent tension exists between claiming that Moving Defendants were deliberately indifferent to Maldonado's medical needs and that Moving Defendants were negligent regarding the same.  Generally, "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim."  *Chance*, 143 F.3d at 703 (citation omitted).  However, Plaintiff correctly points out that the Federal Rules of Civil Procedure permit pleading in the alternative.  (*See* Pl.'s Mem. 22–23.)  That is, Rule 8

specifically provides that "[a] party may set out 2 or more statements of a claim . . . alternatively

or hypothetically, either in a single count . . . or in separate ones." Fed. R. Civ. P. 8(d)(2).

Moreover, a party may also state "as many separate claims . . . as it has, regardless of

consistency." *Id*. at (d)(3). "In the Second Circuit, there is no requirement that the alternative

pleadings be made in a technical form," i.e., that the pleading needs to be explicit about pleading

"in the alternative." *City of Almaty, Kazakhstan v. Ablyazov*, No. 15-CV-5345, 2019 WL

1430155, at *5 (S.D.N.Y. Mar. 29, 2019) (quotation marks omitted). Therefore, both theories of

liability may move forward, and the Court declines to dismiss any state law claim on this ground.

*See Kruse v. Wells Fargo Home Mortg., Inc.*, 383 F.3d 49, 55 n.3 (2d Cir. 2004) (noting that

inconsistent theories may be pleaded under Federal Rule 8); *Brown v. City of New York*, No. 02-

CV-6337, 2005 WL 758781, at *4 (E.D.N.Y. Mar. 30, 2005) ("While it is true that the same

factual predicate cannot support both a finding of liability based on reckless or intentional

conduct and a finding of liability based on negligent conduct, [P]laintiff is free to plead alternate

theories of liability, even if those theories are inconsistent. . . . It will be up to the trier of fact to

determine which, if either, theory is proven by [P]laintiff." (citations omitted)).

### c.  Distributees

Under New York law, "to state a claim for wrongful death, the decedent's personal

representative must plead: '(1) the death of a human being; (2) a wrongful act, neglect[,] or

default of the defendant that caused the decedent's death; (3) the survival of distributees who

suffered pecuniary loss by reason of the decedent's death; and (4) the appointment of a personal

representative of the decedent.'" *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 398

(S.D.N.Y. Dec. 10, 2013) (citations omitted).

The Amended Complaint fails to mention the existence of distributees or their pecuniary loss anywhere in the pleadings.  Although Plaintiff claims that this is an argument that is better addressed at summary judgment, (*see* Pl.'s Mem. 24), the existence of distributees and their pecuniary loss are *pleading* requirements, and the failure to allege these elements may result in dismissal at the pleading stage, *see Chamberlain*, 986 F. Supp. 2d at 398; *see also McKenzie*, 2018 WL 6831157, at *8 (explaining that the plaintiff's "wrongful death claims fail because [the] plaintiff fails to allege distributees who have suffered a pecuniary loss" because of the alleged death (citation omitted)).[14]   Plaintiff posits that Maldonado's parent is automatically a distributee under New York law, *see In re Air Crash at Belle Harbor, N.Y. on Nov. 12, 2001*, Nos. 02-MDL-1448, 02-CV-3161, 02-CV-4755, 03-CV-8322, 2005 WL 1162448, at *6 (S.D.N.Y. May 10, 2005), and this may be true, but that still would not cure the fatal flaw of Plaintiff's failure to allege any pecuniary loss from Maldonado's death, *see Chamberlain*, 986 F. Supp. 2d at 398–99 (explaining that merely alleging the existence of a distributee does not sufficiently allege pecuniary loss); *see also In re Air Crash*, 2005 WL 1162448, at *7 (identifying a number of factors that must be assessed to determine "whether there existed a reasonable expectation of voluntary assistance," where, as here, "the decedent was under no legal obligation to support a distributee" (citation omitted)).  Plaintiff's counsel has had ample time to

---

[14] Plaintiff has cited only one case in which the same question happened to be dealt with at summary judgment.  Nothing within that court's decision suggested that the question of distributees may *only* be resolved at summary judgment.  *See Pub. Adm'r of Queens Cty. ex rel. Estate & Beneficiaries of Guzman v. City of New York*, No. 06-CV-7099, 2009 WL 498976, at *12 (S.D.N.Y. Feb. 24, 2009).

amend the pleading as needed, and the required allegations for a wrongful death claim under New York law are clear.  Accordingly, the wrongful death claim is dismissed.[15]

### III.  Conclusion

For the foregoing reasons, the Court grants Moving Defendants' Motion To Dismiss with respect to the wrongful death claim and the scope of Attalienti's personal involvement but denies it in all other respects.  As Plaintiff has already amended her Complaint once, the dismissal is with prejudice.  Therefore, the Action will proceed on the remaining claims.

The Clerk of the Court is respectfully requested to terminate the pending Motion.  (Dkt. No. 86.)  The Parties are scheduled for a status conference on June 11, 2020 at 11:30 a.m. SO ORDERED.

DATED:       May 18, 2020
             White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[15] Of course, the possibility of proving similar damages and recovering under the remaining federal and state law claims still exists.