UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NANCY MALDONADO, *as the Administratrix of the Estate of Jonathan Maldonado*,

                                        Plaintiff,

    v.

TOWN OF GREENBURGH, *et al.*,

                                        Defendants.

---

No. 18-CV-11077 (KMK)

OPINION & ORDER

<u>Appearances</u>:

Debra Sue Cohen, Esq.
Randolph M. McLaughlin, Esq.
Newman Ferrara LLP
New York, NY
*Counsel for Plaintiff*

Kenneth Ethan Pitcoff, Esq.
Michael Adam Czolacz, Esq.
Cristina A. Soller, Esq.
Rebecca June Rosedale, Esq.
Morris Duffy Alonso & Faley
New York, NY
*Counsel for Defendant Town of Greenburgh*

Richard L. Marasse, Esq.
Town of Greenburgh, Office of Town Attorneys
Greenburgh, NY
*Counsel for Defendant Town of Greenburgh*

Thomas J. Troetti, Esq.
Law Offices of Thomas J. Troetti
Rye, NY
*Counsel for Defendant Police Officer Jean-Paul Lara, Lieutenant Gregory P. Attalienti, Police Officer Richard Maguire, and Detective/Paramedic Sean Freeman*

KENNETH M. KARAS, United States District Judge:

Nancy Maldonado ("Plaintiff") brings this Action in her capacity as the Administratrix of the Estate of Jonathan Maldonado, against the Town of Greenburgh (the "Town"), Police Officer Jean-Paul Lara ("Lara"), Lieutenant Gregory P. Attalienti ("Attalienti"), Police Officer Richard Maguire ("Maguire"), and Detective/Paramedic Sean Freeman ("Freeman"; collectively, "Defendants"), pursuant to 42 U.S.C. § 1983 and New York common law. (*See generally* Am. Compl. (Dkt. No. 63).) Plaintiff alleges numerous constitutional violations and tort claims arising out of Jonathan Maldonado's death on November 27, 2017, including claims for excessive force, deliberate indifference to medical needs, negligence, and wrongful death. (*See id.*) Before the Court is Defendants' Joint Motion for Partial Summary Judgment. (Not. of Mot. (Dkt. No. 225).) For the foregoing reasons, Defendants' Motion is granted.

## I. Background

### A. Factual Background

The following facts are taken from the Parties' Local Civil Rule 56.1 statements and admissible evidence submitted in connection with their papers. (*See* Rule 56.1 Statement ("Defs' 56.1") (Dkt. No. 227); Pl's Rule 56.1 Counterstatement ("Pl's 56.1") (Dkt. No. 233); Defs' Resp. to Pl's Counterstatement ("Defs' Resp. 56.1") (Dkt. No. 239.)[1]

---

[1] Local Rule 56.1(b) allows a non-movant to add "a separate, short and concise statement of additional material facts" apart from the paragraph-by-paragraph response required by subsection (a). Local Rule 56.1 does not, however, provide for "a responsive 56.1 Statement to include additional facts that are not in dispute but that a party opposing summary judgment simply thinks are important[.]" *Allen v. Koenigsmann*, No. 23-CV-5651, 2024 WL 403113, at *3 (S.D.N.Y. Feb. 2, 2024) (quoting *Ostreicher v. Chase Bank USA, N.A.*, No. 19-CV-8175, 2020 WL 6809059, at *1 n.1 (S.D.N.Y. Nov. 19, 2020)). And any additional facts "should be confined to material facts in dispute." *See id.*

Plaintiff's supplemental statement—consisting of 321 additional paragraphs—does not entirely adhere to those limits. (*See* Pl's 56.1 ¶¶ 450–771.) The *vast* majority of those paragraphs addresses events covered in Defendants' initial statement, albeit with some additional detail. (*See id.* ¶¶ 450–637.) Additionally, portions of both Parties' statements summarize

### 1. Events Prior to Defendants' Arrival

On November 29, 2017, at approximately 5:00 PM, Christian Maldonado ("Christian")

left his house and drove to a shopping complex with his nephew Jonathan Maldonado (for

purposes of this section, "Jonathan," thereafter, "Maldonado").  (Defs' 56.1 ¶¶ 13–16; Pl's 56.1

¶¶ 13–16.)  At around 5:30 PM, after visiting a few stores, the pair drove to a nearby BestBuy.

(Defs' 56.1 ¶¶ 18–20; Pl's 56.1 ¶¶ 18–20.)  They spent a five-to-ten minutes in the back of the

store, where BestBuy sold phones, before Christian left to wait by his car.  (Defs' 56.1 ¶¶ 22–23;

Pl's 56.1 ¶¶ 22–23.)

Around the same time, Shannon Varian ("Varian"), a BestBuy employee, heard from a

colleague that someone stole a display model iPhone and ran towards the front door.  (Defs' 56.1

¶ 25; Pl's 56.1 ¶ 25.)  Soon after, a store alarm sounded, and Jonathan was seen exiting the store.

(*See* Defs' 56.1 ¶ 29; Pl's 56.1 ¶ 29; Decl. of Thomas J. Troetti in Supp. of Mot. ("Troetti

Decl."), Ex. TT ("Russo Dep.") at 20:6–14 (Dkt. No. 226-46).)  Several BestBuy employees

followed in pursuit, including Varian, Jairo Ramos ("Ramos"), and Eric Lopez ("Lopez").

Stephen Russo ("Russo"), a customer, also left the store and observed the four BestBuy

employees chasing Jonathan through a parking lot in front of the store's main entrance.  (Defs'

56.1 ¶¶ 34–37; Pl's 56.1 ¶¶ 34–37.)  Christian ran after the group and saw them cross Central

---

expert reports and testimony that appear to have minimal, if any, relevance to the instant Motion.
(*See* Defs' 56.1 ¶¶ 333–406 (summarizing testimony of Defendants' expert toxicologist); *see* Pl's
56.1 ¶¶ 699–709 (stating what amount to arguments supported by testimony subject to
Defendants' *Daubert* Motion).)  The Court disregards assertions in both sets of statements to the
extent they are "redundant" or otherwise do not comply with Rule 56.1.  *See Congregation
Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 397 (S.D.N.Y. 2015)
(disregarding assertions that were "redundant" and otherwise "contrary to the letter and spirit of
Local Rule 56.1"); *see also Mayaguez S.A. v. Citigroup, Inc*., No. 16-CV-6788, 2021 WL
1799653, at *6 (S.D.N.Y. Apr. 30, 2021) (noting courts may "simply disregard" improper
assertions in Rule 56.1 statements).

Avenue, which abutted the parking lot.  (Defs' 56.1 ¶¶ 39, 51, 154–55; Pl's 56.1¶¶ 39, 51, 154–55.)

The BestBuy employees eventually caught up to Jonathan as he was walking south towards Webb Field and formed a circle around him.  (Defs' 56.1 ¶¶ 50, 52–53; Pl's 56.1 ¶¶ 50, 52–53.)  As Christian was approaching the group, Jonathan bumped into Lopez and fell to the ground.  (*See* Defs' 56.1 ¶¶ 56–57; Pl's 56.1 ¶¶ 56–57; Troetti Decl., Ex. SS ("Lopez Dep.") at 37:15–38:9 (Dkt. No. 226-45).)[2]

At 5:47:57—while the BestBuy employees were following Jonathan through the parking lot—Varian had called 911 to report a suspected shoplifter.  (Defs' 56.1 ¶ 58; Pl's 56.1¶ 58; *see also* Troetti Decl., Ex. D ("911 Call Transcript") (Dkt. No. 226-4).)  She remained on the line as the group reached Maldonado at Webb Field.  (Defs' 56.1 ¶ 64; Pl's 56.1 ¶ 64.)

While Varian was still on the phone, Jonathan grabbed what appeared to be a wallet from his back pocket.  (Defs' 56.1 ¶¶ 64–65; Pl's ¶¶ 56.1 64–65.)  Varian and Ramos then observed Maldonado take "little envelopes" out of the wallet and place them in his mouth.[3]  (Defs' 56.1 ¶¶ 66–67; Pl's 56.1 ¶¶ 66–67.)

### 2.  Defendant Maguire Arrives

At 5:51:09, Defendant Officer Richard Maguire ("Maguire") arrived on the scene.  (Defs' 56.1 ¶ 75; Pl's 56.1 ¶ 75.)  As soon as Maguire got out of his vehicle, Varian and Ramos told

---

[2] The Parties dispute whether Jonathan hit Lopez, or whether the two just fell to the ground.  (*See* Pl's 56.1 ¶ 56.)

[3] Plaintiff at several points disputes whether Jonathan "swallowed" the envelopes.  (*See, e.g.*, Pl's 56.1 ¶ 66; *see also* Decl. of Randolph McLaughlin ("McLaughlin Decl."), Ex. 15 ("Ramos Dep.") at 61:1–3 (Dkt. No. 235-15) (Ramos stating that he "didn't see" any "effort to swallow those envelopes").)  The dispute does not come up in the instant Motion but appears to be material to whether Jonathan ingested the envelopes' contents.

him that Jonathan had "th[rown] something into his mouth," (McLaughlin Decl., Ex. 15 ("Ramos Dep.") at 61:7–11; 62:23–63:9 (Dkt. No. 235-15)), and that he may have "swallowed something," (Lopez Dep. at 64).  Maguire then ran over to Jonathan, who was attempting to stand up, and tackled him to the ground.  (Defs' 56.1 ¶¶ 78–79, 88; Pl's 56.1 ¶¶ 78–79, 88.)[4] While on the ground on top of Jonathan, Maguire commanded him two-or-three times to "spit it out."  (Defs' 56.1 ¶ 80; Pl's 56.1 ¶ 80; *see also* Russo Dep. at 82:12–83:19 (stating Maguire yelled "spit it out" at least twice); Ramos Dep. at 64:14–65:2 (stating Maguire shouted that command more than three times).)  At some point, Maguire moved to Jonathan's right side and tried to move Jonathan's right arm from underneath him.  (Defs' 56.1 ¶ 91; Pl's 56.1 ¶ 91.)

### 3.  Defendants Freeman and Lara Arrive

Defendant-Officers Sean Freeman ("Freeman") and Jean-Paul Lara ("Lara") also responded to the scene.

Unlike the other officers in involved in this case, Freeman operated a police unit with paramedic equipment, which allowed him to respond to Emergency Medical Service ("EMS") calls and treat patients.  (Defs' 56.1 ¶ 93; Pl's 56.1 ¶ 93.)  In other words, he served dual functions as officer and paramedic.  Freeman's vehicle was also equipped with a dash camera that began recording video and audio footage after he activated the vehicle's emergency lights enroute to Webb Field.  (Defs' 56.1 ¶ 94; Pl's 56.1 ¶ 94; *see also* Troetti Decl., Ex. G ("Dash Cam. Recording") (Dkt. No. 226-7).)[5]

---

[4] The exact circumstances of this encounter are unclear.  Plaintiff, disputing Defendants' account, states that Jonathan "was attempting to get up off the ground," (Pl's 56.1 ¶ 78 (citing Lopez Dep. at 47–48)), and that Maguire either tackled or slammed Jonathan to the ground, (*id*. ¶ 79).

[5] Defendants provide an affidavit attesting to the authenticity of the dash camera recording and the Greenburgh Police Department's methods of obtaining those recordings.  (*See*

Freeman and Lara arrived close in time—at 5:51:20 and 5:51:29 respectively. (*See* Defs'
56.1 ¶ 108 & n.8; Pl's 56.1 ¶ 108).) Freeman ran from his vehicle and approached Maguire and
Jonathan on the ground.[6] Maguire and Freeman at that point were on opposite sides of Jonathan
trying to remove his arms from underneath him. (Defs' 56.1 ¶ 117; Pl's 56.1 ¶ 117.)

### 4. Defendant Lara's Taser Use

When Lara exited his car, he also started running towards Maguire, who he saw
struggling with Jonathan on the ground, and drew his Taser. (Defs' 56.1 ¶ 109; Pl's 56.1 ¶ 109.)
As he got closer, Lara heard Maguire command Jonathan twice to "spit it out." (Defs' 56.1
¶ 111; Pl's 56.1 ¶ 111; Dash Cam. Recording at 2:15–16).) Lara later testified that he reached
for his Taser based, in part, on his belief that Jonathan "was adamant about not giving up." (*See*
Troetti Decl., Ex. VV ("Lara Dep.") at 61:8–13; 70:10–20, 75:17–23 (Dkt. No. 226-48).)

Lara then reached the three individuals on the ground and said "Watch out, Taser." (See
Troetti Decl., Ex. H ("Taser Recording") at 5:51:44(Dkt. No. 226-8).)[7] Some seconds later, Lara

---

*generally* Toretti Decl., Ex. E (Dkt. No. 226-5).) The specific times cited in this section are
largely based on timestamps from Freeman's dash camera.

[6] Plaintiff disputes whether Freeman knelt down next to Jonathan, per Russo's testimony
(*see* Russo Dep. at 91:24–92:2), or whether he "pounced" on Jonathan. (*See* Pl's 56.1 ¶ 116.)
To support the latter account, Plaintiff cites "Russo['s] Rewritten Notes." (*Id.*) These notes do
not appear in Plaintiff's materials and it is far from clear that they would constitute an admissible
present-sense impression, or fall under any other hearsay exception. *See Sec. & Exch.
Comm'n v. AT&T, Inc.*, 626 F. Supp. 3d 703, 738 n.39 (S.D.N.Y. 2022) ("Handwritten notes are
admissible hearsay as a present-sense impression under Rule 803(1) where the note describes an
event personally perceived by the declarant and which is made contemporaneously or
immediately after the event described." (alteration adopted) (quoting *Okoroafor v. City of New
York*, No. 07-CV-9387, 2013 WL 5462284, at *2 n.3 (S.D.N.Y. Sept. 25, 2013)).

[7] The Parties dispute whether this constituted a warning to Jonathan. (*See* Pl's 56.1
¶ 127.) The audio recording from Lara's Taser is fuzzy and it is hard to tell how many seconds
elapsed from this "warning" until Lara discharged the Taser. It is also hard to determine
whether Lara warned Jonathan or his fellow officers a second time before he fired. (*See* Defs'
56.1 ¶ 124 n.9; *see also* Pl's 56.1 ¶ 138.)

fired the Taser in probe mode towards Jonathan's lower back.  (Defs' 56.1 ¶ 132; Pl's 56.1 ¶ 132.)  The probe made a "loud crackling" sound which indicated to Lara that it made a poor connection.  (Defs' 56.1 ¶ 134; Pl's 56.1 ¶ 134.)  He and Maguire then shouted, "pull your hand out."  (Defs' 56.1 ¶ 136; Pl's 56.1 ¶ 136; *see also* Taser Recording at 5:51:48, 5:51:50.)  Lara did not observe a change in Jonathan's behavior and, a few seconds later, discharged the Taser in drive-stun mode towards the back of Jonathan's leg.  (Defs' 56.1 ¶ 137; Pl's 56.1 ¶ 137.)[8]

The objective of deploying a Taser in probe mode is to cause neuromuscular incapacitation ("NMI").  (Defs' 56.1 ¶ 132 n.10; Pl's 56.1 ¶ 132 n.10.)  Fired properly, the Taser probes will make contact some distance apart and create a closed circuit, causing an electric current to run through enough muscle mass for a person to be incapacitated.  (Lara Dep. at 12:15–14:9.)  By contrast, "drive-stun" mode involves applying the Taser head directly to an individual and is used to achieve compliance, or NMI, through pain.  (*Id*. at 18:9–25.)

Once Lara deployed the Taser in drive-stun mode, Maguire was able to access Jonathan's arms and handcuff him.  (Defs' 56.1 ¶ 143; Pl's 56.1 ¶ 143.)  The whole sequence, from Lara running from his vehicle to the second Taser discharge, occurred between 5:51 and 5:52 PM and lasted about 20-to-25 seconds.  (Defs' 56.1 ¶ 142; Pl's 56.1 ¶ 142.)[9]

Shortly after, at 5:52:08, a fourth officer Defendant Attalienti ("Attalienti") arrived at Webb Field.  Consistent with the events above, he observed Lara kneeling on the ground next to

---

[8] Plaintiff disputes the circumstance surrounding the second Taser discharge but fails to elaborate as to the nature of the dispute.  (*See* Pl's 56.1 ¶ 137.)

[9] The Parties dispute the exact timing of the discharges due to a small discrepancy between the time stamps in the Dash Camera and Taser recordings.  (Defs' 56.1 ¶ 142 & n.13; Pl's 56.1 ¶ 142.)  The discrepancy is immaterial to the outcome of the pending Motion.

Maldonado, who was handcuffed, and recalled that Jonathan was nonverbal and making noises. (Defs' 56.1 ¶¶ 146–50; Pl's 56.1 ¶¶ 146–50.)

### 5.  Medical Treatment at Webb Field

From approximately 5:53:00 to 5:53:30, Freeman began interacting with Jonathan.[10] Freeman first asked questions to assess Maldonado's level of consciousness but could not get a response.  (Defs' 56.1 ¶ 170; Pl's 56.1 ¶ 170.)  Freeman then placed Maldonado in a seated position and performed a medical assessment, which revealed that Maldonado was taking "shallow and slow" breaths.  (Defs' 56.1 ¶ 171–72; Pl's 56.1 ¶ 171–72; *see also* Troetti Decl., Ex. 49 ("Freeman Dep.") at 60:16–20 (Dkt. No. 226-49).)  A finger sweep of Jonathan's mouth did not reveal obstructions in his airway, leading Freeman to assess that Jonathan ingested drugs. (Freeman Dep. at 60:20–61:2.)  In his experience, Jonathan's level of consciousness and respiration resembled opiate overdoses he had attended to in the past.  (Freeman Dep. at 65:8– 18.)  However, Freeman could not recall if Jonathan exhibited other signs of overdose, like pinpoint pupils.  (*Id*. at 61:3–18.)

Shortly after, at 5:53:37, Lara radioed requesting a "bus," i.e., an ambulance.  (Defs' 56.1 ¶ 179 & n.15; Pl's 56.1 ¶ 179.)  Jovan Thompson ("Thompson"), a civilian emergency medical technician ("EMT") responded and was enroute to Webb Field by 5:53:43.  (*See* Defs' 56.1 ¶ 180; Pl's 56.1 ¶ 180.)

At 5:53:48, Freeman called for Narcan—a drug used to counteract narcotic overdoses— and ran to his vehicle at 5:54:01.  (Defs' 56.1 ¶ 187, Pl's 56.1 ¶ 187; *see also* Freeman Dep. at 72:17–18 (explaining that Narcan can be used to restore adequate respiration in the event of an overdose).)  It took about a minute-and-a-half to ready an intramuscular dose, and some more

---

[10] Freeman's body camera begins recording at roughly 5:53:03, but the Parties dispute when exactly he was asking questions as the recording lacks audio for the first 30 seconds.

time to cut Maldonado's shirt and find an injection point.  (Defs' 56.1 ¶ 190. 195–98; Pl's 56.1 ¶ 190, 195–98.)  Freeman then administered Narcan to Jonathan.  (Defs' 56.1 ¶ 199; Pl's 56.1 ¶ 199.)  Freeman later testified that, in his experience, Narcan takes 30 seconds to one minute to produce adequate respiration.  (Defs' 56.1 ¶ 207; Pl's 56.1 ¶ 207.)

At 5:57:22, Thompson, who had since arrived, asked Freeman if he wanted another Narcan dose, and at some point afterwards administered a version of the drug fitted as a nasal spray.  (Defs' 56.1 ¶¶ 206, 218; Pl's 56.1 ¶¶ 206, 218; *see also* Troetti Decl., Ex. XX at 23:2–26:18 (Dkt. No. 226-50) (explaining Thompson first had to run back to his ambulance to retrieve and atomizer).)  Maldonado's respiration, however, did not improve, and at 5:57:57, Freeman stated that he needed a bag valve mask—a mask designed to administer air.  (Defs' 56.1 ¶¶ 207–10; Pl's 56.1 ¶¶ 207–10.)

At 5:58:32, Freeman ran to his vehicle, grabbed an advance life support ("ALS") bag, and proceeded to prepare the ambulance to administer breathing assistance.  (Defs' 56.1 ¶¶ 215–17; Pl's 56.1 ¶¶ 215–17.)  At 5:59:49, Freeman ran back to Jonathan, who at that point was lying unresponsive and motionless on a stretcher, and ran him to the ambulance.  (Defs' 56.1 ¶¶ 221, 225; Pl's 56.1 ¶¶ 221, 225.)

### 6.  Medical Treatment in the Ambulance

Inside the ambulance, Freeman attempted to open Jonathan's airway using a laryngoscope—a metal tube used to manipulate a person's tongue and visualize their trachea.  (Defs' 56.1 ¶ 236; Pl's 56.1 ¶ 236; *see also* Troetti Decl., Ex. YY ("Marello Dep.") at 73:22–74:2 (Dkt. No. 226-51).)  Freeman saw glassine envelopes in Jonathan's throat and used forceps to remove them.  (Defs' 56.1 ¶ 239; Pl's 56.1 ¶ 239; *see also* Freeman Dep. 79:24–80:22.)[11]  He

---

[11] Plaintiff disputes where the glassine bags were lodged in Maldonado's throat.  Freeman testified that he observed the bags "in the esophagus," (see Freeman Dep. at 80:7–9), while

next inserted an endotracheal tube fitted with a bag valve mask designed to deliver oxygen directly to Jonathan's lungs.  (Defs' 56.1 ¶ 241; Pl's 56.1 ¶ 241.)

A few other things happened as well, although it is not clear in exactly what order. Around the time Jonathan was placed in the ambulance, Kenneth Marello, another civilian EMT arrived at Webb Field.  (*See* Defs' 56.1 ¶¶ 230–31; Pl's 56.1 ¶¶ 230–31.)  Marello entered the ambulance, checked Maldonado's pulse, but could not feel one and noticed Jonathan was not breathing.  (Defs' 56.1 ¶ 234; Pl's 56.1 ¶ 234.)  He made an initial assessment that Jonathan needed ventilation and that he appeared to be in cardiac arrest.  (Marello Dep. at 57:14–18, 103:2–4.)  Marello then obtained IV access, hooked Maldonado up to a cardiac monitor—an EKG—and began administering epinephrine.  (Defs' 56.1 ¶ 244; Pl's 56.1 ¶ 244.)

The EKG revealed that Jonathan was in asystole, a form of cardiac arrest.  (Defs' 56.1 ¶ 245; Pl's 56.1 ¶ 245.)  One of the paramedics then began to administer CPR, (Defs' 56.1 ¶¶ 242, 246; Pl's 56.1 ¶¶ 242, 246), at first manually and then with a machine designed to deliver chest compressions automatically, (Defs' 56.1 ¶ 247; Pl's 56.1 ¶ 247; *see also* Marello Dep. at 101:13–19 (describing a LUCAS machine)).  The record is not clear about when exactly chest compressions began, and whether they were administered continuously before the LUCAS machine was attached.  (Pl's 56.1 ¶ 242; Marello Dep. at 103:2–104:6.)

Also unclear is when exactly the ambulance left Webb Field.  However, it eventually arrived at White Plains Hospital, and Jonathan was transferred to the care of the attending

---

Plaintiff cites testimony from Marello stating the bags were removed from Maldonado's "airway," (Marello Dep. At 94:24–95:5).  The dispute, in addition to the dispute about whether Jonathan "swallowed" the bags, appears to relate to Jonathan's cause of death and is not determinative of the instant Motion.

emergency room physician at 6:23 PM.  (Defs. 56.1 ¶¶ 250–51; Pl's 56.1 ¶¶ 250–51.)  He was pronounced dead at 6:54 PM.  (Defs' 56.1 ¶ 271; Pl's 56.1 ¶ 271.)

7.  Autopsy and Toxicology Reports

On November 30, 2017, Westchester Deputy Medical Examiner Aleksandar Milovanovic conducted an autopsy on Maldonado.  (Defs' 56.1 ¶ 278; Pl's 56.1 ¶ 278.)[12]  Among other things, Milanovic found that Jonathan's lungs took on a significant amount of fluid, which can be a result of opioid use.  (Defs' 56.1 ¶¶ 288–90; Pl's 56.1 ¶¶ 288–90.)

On December 22, 2017, Westchester Forensic Scientist Maurice Woodbyne tested trace tan material found on the inside of one of the glassine envelopes retrieved from Jonathan's throat.  It tested positive for heroin and fentanyl.  (*See* Troetti Decl., Ex. W ("Forensic Testing Report") (Dkt. No. 226-23).)  Those tests only examined the bag's contents and did not measure the weight of each bag or whether the bags had leaked.  (*See* Pl's 56.1 ¶ 283; Troetti Decl., Ex. CCC ("Milanovic Dep.") at 137:3–10 (Dkt. No. 226-55).)

Additionally, on January 31, 2018, Westchester Toxicologist Elizabeth Spratt tested post-mortem blood and urine samples, both of which came up positive for fentanyl, acetyl fentanyl, and methoxy acetyl fentanyl.  (Defs' 56.1 ¶ 285; Pl's 56.1 ¶ 285.)

Having reviewed those findings, Milanovic issued an autopsy report and determined that Jonathan's cause of death was "Acute mixed drug intoxication:  (Fentanyl, Acetyl Fentanyl, Methoxy Acetyl Fentanyl, Heroin) Accident."  (*See generally* Troetti Decl., Ex. V ("Autopsy Report") 14 (Dkt. No. 226-22).)

---

[12] The Parties debate whether Milovanovic's findings support alternative cause-of-death theories.  The Court notes that dispute for the record but need not describe it in detail as Defendants do not move for summary judgment on any causation-related issues.  (*See, e.g.*, Pl's 56.1 ¶ 279–81; *see generally* Defs' Mem.)

As explained in detail, infra Section II.C.1.b., Plaintiff's expert, Dr. Michael Baden, reviewed this evidence and reached a different conclusion. He opined that Jonathan died from respiratory and cardiac arrest caused by the restraints placed on Jonathan while he was on the ground, in addition to Lara's Taser use. (*See generally* McLaughlin Decl., Ex. 58 ("2018 Report") (Dkt. No. 235-58).)

### 8. Maldonado's History of Drug Use

Prior to this case, Jonathan's parents had no personal knowledge of him taking any illegal drugs. (McLaughlin Decl., Ex. 39 at 47:4–20 (Dkt. No. 235-39).) In September 2017, Jonathan's parents were concerned that he had lost some weight—perhaps as a result of drug use—and performed an over-the-counter drug test that came back negative. (*See* Pl's 56.1 ¶¶ 646; Defs' Resp. 56.1 ¶¶ 646.)

Treatment records from Jonathan's physician, however, indicated that he was a "marijuana smoker" and that he suffered from acute sinusitis, shortness of breath, and acute bronchitis. (Pl's 56.1 ¶ 651; Defs' Resp. 56.1 ¶ 651; *see also* Toretti Decl., Ex. PP ("Rabadi Dep.") at 26:1–6 (recounting drug test that returned positive for cannabinoids) (Dkt. No. 226-42).)

Shortly after his death, Jonathan's mother recalled seeing a folded packet of Suboxone— a medication used to treat opioid use—in between the upper mattress and support rail of the bunk bed in his room. (Pl's 56.1 ¶¶ 660, 662; Defs' Resp. 56.1 ¶¶ 660.) She forgot where she placed the packet but discovered it on April 16, 2021, after which it was added to the record. (Pl's 56.1 ¶ 661; Defs' Resp. ¶ 661.)[13] Neither of the treatment providers deposed in this case recalls prescribing Suboxone to Maldonado. (Pl's 56.1 ¶ 659; Defs' Resp. ¶ 659.)

---

[13] Defendants sought to preclude any evidence about the Suboxone packet because it was introduced after the close of discovery. (*See* Mot. to Preclude (Dkt. No. 157.) Magistrate Judge

B.  Procedural History

On June 21, 2023, Defendants filed a pre-motion letter in anticipation of the instant

Motion.  (Dkt. No. 219.)  Plaintiff responded, (Dkt. No. 220), and the Court held a pre-motion

conference where it adopted a briefing schedule, (see Dkt. (minute entry for July 21, 2023); Am.

Sched. Order (Dkt. No. 224).)

Pursuant to that schedule, Defendants filed the instant Motion on October 23, 2023.  (See

Not. of Mot.; Troetti Decl.; Defs' 56.1; Mem. of Law in Supp. of Defs' Mot. ("Defs' Mem.")

(Dkt. No. 228).)  After an extension, (*see* Dkt. No. 229), Plaintiff filed her Opposition on

February 21, 2024, (*see* Pl's Mem. of Law in Opp. to Defs' Mot. ("Pl's Mem.") (Dkt. No. 231);

Pl's 56.1; McLaughlin Decl.)  After an extension of their own, (*see* Dkt. No. 237), Defendants

filed a reply on April 9, 2024.  (Joint Reply Mem. of Law ("Defs' Reply") (Dkt. No. 238); Defs'

Resp. 56.1).)

II.  Discussion

A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir.

2014) (same) (quoting Fed. R. Civ. P. 56(a)).  "In deciding whether to award summary judgment,

the court must construe the record evidence in the light most favorable to the non-moving party

and draw all reasonable inferences in its favor."  *Torcivia v. Suffolk County*, 17 F.4th 342, 354

---

Andrew Krause denied that Motion in a March 31, 2022, decision, and granted Plaintiff's request
to reopen discovery.  (*See* Decision & Order (Dkt. No. 174).)  Defendants objected to that ruling,
and this Court affirmed.  *See Maldonado v. Town of Greenburgh*, No. 18-CV-11077, 2022 WL
2359800 (S.D.N.Y. June 30, 2022).

(2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the non[-]moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration adopted) (internal quotation marks and citation omitted); *see also U.S. Bank Nat'l Ass'n as Tr. for Reg. Holders of J.P. Morgan Chase Com. Mortg. Sec. Corp., Multifamily Mortg. Pass-Through Certificates, Series 2017-SB42 v. 160 Palisades Realty Partners LLC*, No. 20-CV-8089, 2022 WL 743928, at *3 (S.D.N.Y. Mar. 10, 2022) (same). Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that h[er] allegations were correct; [s]he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)); *see also Jennifer Fung-Schwartz, D.P.M, LLC v. Cerner Corp.*, No. 17-CV-233, 2023 WL 6646385, at *3 (S.D.N.Y. Oct. 12, 2023), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks and citation omitted); *see also Kollias v. Univ. of Rochester*, No. 18-CV-6566, 2023 WL 5608868, at *4

(W.D.N.Y. Aug. 30, 2023) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading." (quoting *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009))). Indeed, "[w]hile summary judgment must be granted with caution in employment discrimination actions, . . . a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 302 (S.D.N.Y. 2009) (internal quotation marks and citation omitted); *see also Streichert v. Town of Chester*, No. 19-CV-7133, 2022 WL 4449305, at *4 (S.D.N.Y. Sept. 23, 2022) ("It is the law of this Circuit that summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact, and may be appropriate even in the fact-intensive context of discrimination cases." (alteration omitted) (quoting *Schiano v. Quality Payroll Sys., Inc*., 445 F.3d 597, 608 (2d Cir. 2006))).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Seward v. Antonini*, No. 20-CV-9251, 2023 WL 6387180, at *12 (S.D.N.Y. Sept. 29, 2023) (quoting *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014)). "At this stage, 'the role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'" *U.S. Sec. & Exch. Comm'n v. Amah*, No. 21-CV-6694, 2023 WL 6386956, at *8 (S.D.N.Y. Sept. 28, 2023) (alteration adopted) (quoting *Brod v. Omya*, 653 F.3d 156, 164 (2d Cir. 2011)). Therefore, "a court's goal should be 'to isolate and dispose of factually unsupported claims.'" *Id.* (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986))).

When ruling on a summary judgment motion, a district court should "consider only evidence that would be admissible at trial." *Latimer v. Annucci*, No. 21-CV-1275, 2023 WL 6795495, at *3 (S.D.N.Y. Oct. 13, 2023) (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998)). "Where a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *Mozzochi v. Town of Glastonbury*, No. 21-CV-1159, 2023 WL 3303947, at *3 (D. Conn. May 8, 2023) (quoting Fed. R. Civ. P.56(c)(4)); *see also DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (same); *E. Fishkill Fire Dist. v. Ferrara Fire Apparatus, Inc.*, No. 20-CV-576, 2023 WL 6386821, at *11 (S.D.N.Y. Sept. 28, 2023) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ." (internal citation omitted)); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal quotation marks and citation omitted)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Martinez v. Pao's Cleaning, Inc.*, No. 16-CV-6939, 2018 WL 6303829, at *2 (E.D.N.Y. Dec. 3, 2018) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005)). However, although witness credibility is usually a question of fact for the jury, *Yu Zhang v. Sabrina USA Inc.*, No. 18-CV-12332, 2021 WL 1198932, at *3 (S.D.N.Y. Mar. 30, 2021), "[b]road, conclusory attacks on the credibility of a witness without more [are] insufficient to raise a genuine issue of material fact that would defeat a motion for

summary judgment," *Sec. & Exch. Comm'n v. Airborne Wireless Network*, No. 21-CV-1772,

2023 WL 5938527, at *6 (S.D.N.Y. Sept. 12, 2023) (internal quotation marks and citation

omitted); *see also Ezuma v. City Univ. of N.Y.*, 665 F. Supp. 2d 116, 128 (E.D.N.Y. 2009) ("If

the moving party has made a properly supported motion for summary judgment, the plaintiff

may not respond simply with general attacks upon the defendant's credibility." (alterations

omitted) (internal quotation marks and citation omitted)).  As such, "when opposing a motion for

summary judgment, the non-moving party may not respond simply with general attacks upon the

declarant's credibility, but rather must identify affirmative evidence from which a jury could find

that the non-moving party has carried its burden of proof."  *Moritz v. Town of Warwick*, No. 15-

CV-5424, 2017 WL 4785462, at *8 (S.D.N.Y. Oct. 19, 2017) (alterations adopted) (internal

quotation marks and citation omitted); *see also Paul v. Postgraduate Ctr. for Mental Health*, 97

F. Supp. 3d 141, 181 (E.D.N.Y. 2015) ("'Although credibility assessments are improper on a

motion for summary judgment,' a court may be justified in dismissing a claim when the

'plaintiff's version of the events is in such discord with the record evidence as to be wholly

fanciful.'" (quoting *Pulliam v. Lilly*, No. 07-CV-1243, 2010 WL 935383, at *5 (E.D.N.Y.

Mar. 11, 2010))).

Additionally, "[g]iven the difficult problem posed by a suit alleging that an officer's

excessive force caused a plaintiff's death—namely that the witness most likely to contradict the

officer's story is unable to testify—the court may not simply accept what may be a self-serving

account by the officer."  *Purcell ex rel. Est. of Tyree v. City of New York*, No. 18-CV-3979, 2023

WL 6307735, at *8 (E.D.N.Y. Sept. 28, 2023) (quotation marks omitted).  "Rather, the court

must also consider circumstantial evidence that, if believed, would tend to discredit the officer's

story, and consider whether this evidence could convince a rational factfinder that the officer

acted unreasonably." *Garcia v. Dutchess County*, 43 F. Supp. 3d 281, 289 (S.D.N.Y. 2014)

(alteration adopted) (quoting *O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003), *aff'd in part,*

*dismissed in part sub nom. Garcia v. Sistarenik*, 603 F. App'x 61 (2d Cir. 2015) (summary

order)).

    B.  Qualified Immunity

    "The doctrine of qualified immunity protects government officials from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223,

231 (2009) (quotation marks omitted).  A police officer or other government official will

therefore be protected from liability "where (1) his conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known, or (2) it was

objectively reasonable for him to believe that his actions were lawful at the time of the

challenged act." *Hayes v. Condlin*, No. 22-CV-7295, 2024 WL 776082, at *6 (S.D.N.Y. Feb. 26,

2024) (internal quotation marks omitted) (quoting *Delgado v. City of New York*, No. 19-CV-

6320, 2023 WL 6390134, at *7 (S.D.N.Y. Oct. 2, 2023)); *accord Jenkins v. City of New York*,

478 F.3d 76, 87 (2d Cir. 2007).

    With respect to the first inquiry, a right becomes clearly established if "'controlling

authority' or a 'robust consensus of cases of persuasive authority' have recognized the right at

issue." *McKinney v. City of Middletown*, 49 F.4th 730, 738–39 (2d Cir. 2022) (internal quotation

marks omitted) (quoting *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010)).  The

Supreme Court has emphasized that "clearly established law must be 'particularized' to the facts

of the case and must not be defined 'at a high level of generality.'" *Naumovski v. Norris*, 934

F.3d 200, 211 (2d Cir. 2019) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)); *see also City of*

*Escondido v. Emmons*, 586 U.S. 38, 42 (2019) ("[T]he clearly established right must be defined

with specificity.")). Although "a case directly on point is not required . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 186 (2d Cir. 2020) (quotation marks, citation, and emphasis omitted) (quoting *White*, 580 U.S. at 79). "In other words, an official is immune from liability unless, under the particular circumstances the official faced, any 'reasonable official' would have 'known for certain that the conduct was unlawful' under then-existing precedent." *Id*. at 187 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017)).

At bottom, the doctrine is designed to provide "government officials breathing room to make reasonable but mistaken judgments," and it protects "all but the plainly incompetent or those who knowingly violate the law." *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)); *see also Bangs v. Smith*, 84 F.4th 87, 101 (2d Cir. 2023) (same); *Murphy v. City of Elmira*, No. 18-CV-6572, 2023 WL 5938777, at *10 (W.D.N.Y. Sept. 12, 2023) (same).

C.  Analysis

Defendants seek to exclude testimony of Plaintiff's expert, Dr. Michael Baden, regarding Maldonado's cause of death and seek summary judgment on a few different merits issues. (*See generally* Defs' Mem.)

Because the Parties dispute the precise scope of this Motion, (*see* Pl's 56.1 ¶¶ 2–3), the Court clarifies which issues it considers below. It examines: (1) Defendants' argument that Dr. Baden's testimony is unreliable; (2) whether the individual Defendants were deliberately indifferent to Maldonado's medical needs; (3) whether Lara's use of a Taser constituted excessive force; and (4) whether summary judgement is appropriate on any of the claims against Attalienti.

### 1. Defendants' Daubert Motion

The Court begins with Defendants' Motion to exclude the testimony of Plaintiff's expert, Dr. Michael Baden. (*See* Defs' Mem. 3–14.) Defendants argue that Dr. Baden's opinions, as expressed in his July 9, 2018, report (the "2018 Report"), and his supplemental reports, (*see* McLaughlin Decl., Exs. 59–61), are unreliable because Dr. Baden did not follow an established methodology, did not cite scientific literature, and relied largely on speculation. Plaintiff responds that Dr. Baden's opinions are scientifically valid and that he used methods recommended for trained pathologists. (Pl's Mem. 3–11.)

### a. Legal Framework

At the summary judgment stage, a court can "decide questions regarding the admissibility of evidence, including expert opinion evidence." *PharmacyChecker.com v. Nat'l Ass'n of Boards of Pharmacy*, No. 19-CV-7577, 2023 WL 2973038, at *14 (S.D.N.Y. Mar. 28, 2023) (alteration adopted) (quoting *Gjini v. U.S.*, No. 16-CV-3707, 2019 WL 498350, at *13 (S.D.N.Y. Feb. 8, 2019)). "If a proffer of expert testimony is excluded as inadmissible pursuant to [Federal Rule of Evidence] 702, the court must make the summary judgment determination on a record that does not include that evidence." *Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001). Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[14]

Fed. R. Evid. 702. Although it is the role of the jury to determine the credibility of an expert witness, it is the role of the trial court to serve as a "gatekeep[er]" to ensure that the expert testimony is reliable and relevant before it is presented to the jury. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (finding that the trial judge's gatekeeping obligation applies to all expert testimony); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) (holding that the district court must ensure that a witness is qualified as an expert and "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand").

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *I.M. v. United States*, 362 F. Supp. 3d 161, 191 (S.D.N.Y. 2019) (alteration in original) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007)); *see also LVL XII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 635 (S.D.N.Y. 2016) (same). "[T]he trial judge has broad discretion in the matter of the admission or exclusion of expert evidence[.]" *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962); *see also Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp.*,

---

[14] Rule 702 was amended, effective December 1, 2023, to clarify that a proponent must demonstrate that proffered testimony meets the Rule's requirements by a preponderance of the evidence. *See* Fed. R. Evid. 702 (advisory committee's note to the 2023 amendment). That change was aimed at courts that "had erroneously held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." *Johnson v. United States*, No. 21-CV-2851, 2024 WL 1246503, at *3 n.7 (E.D.N.Y. Jan. 16, 2024) (quotation marks omitted).

"The amendment governs all proceedings commenced on or after December 1, 2023, and all proceedings then pending 'insofar as just and practicable[.]'" *Swanson v. Schindler Elevator Corp.*, No. 21-CV-10306, 2024 WL 967331, at *7 n.2 (S.D.N.Y. Mar. 6, 2024) (quoting U.S. S.Ct. Order § 2 (Apr. 24, 2023) (available online at: https://www.supremecourt.gov/orders/courtorders/frev23_5468.pdf)). The Court need not decide which version of the Rule should apply as "the amendment would not change the outcome here." *See id*.

*LLC*, 571 F.3d 206, 213 (2d Cir. 2009) ("The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous.").

"In determining whether an expert's opinion should be excluded as unreliable, 'the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand.'" *Sunscreen Mist Holdings, LLC v. SnappyScreen, Inc.*, No. 19-CV-835, 2024 WL 1308707, at *1 (E.D.N.Y. Mar. 27, 2024) (*quoting Amorgianos v. Nat'l R.R. Passenger Corp*., 303 F.3d 256, 267 (2d Cir. 2002)).[15]  Neither "*Daubert* [n]or the Federal Rules of Evidence require[] a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Nimely*, 414 F.3d at 396 (italics omitted) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  "Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support

---

[15] The Court notes that reliability is "separate from the threshold question of whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education' to render his or her opinions." *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005) (quoting Fed. R. Evid. 702)).  Among other things, courts typically examine "the totality of the witness's background" to determine whether "the proffered expert has the educational background or training in the relevant field," *PharmacyChecker.com*, 2023 WL 2973038, at *14 (quotation marks omitted), and whether "the expert will actually be testifying on issues or subject matters within his or her area of expertise," *id*.; *see also E. Fishkill Fire Dist.*, 2023 WL 6386821, at *12 (same).

Here, "although the admissibility of a number of [Baden's] opinions is a highly controverted matter, there is no substantial dispute concerning his expert qualifications as a forensic pathologist."  *See Nimely*, 414 F.3d at 396 n.11.  Indeed, Defendants do not make any arguments about qualifications or fit in their Motion, (*see generally* Defs' Mem.), and the Court, having independently reviewed Dr. Baden's qualifications, is satisfied that his decades of experience as a pathologist and medical examiner supply the necessary experience and training to opine on Maldonado's cause of death.  (*See* McLaughlin Decl. Ex. 63 ("Baden CV") (Dkt. No. 235-63) (reflecting Dr. Baden's medical degree, his training as a pathologist, and that he previously served as New York City's Chief Medical Examiner).)

the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion

testimony." *Amorgianos*, 303 F.3d at 266.

b.  Dr. Baden's Opinions

Dr. Baden offered three related opinions about Maldonado's cause of death in his initial

report:

- That "Maldonado did not show any clinical evidence" of a drug overdose on account of his "very high tolerance for [] drugs";

- That "the drug containing baggies that [Maldonado] placed in his mouth . . . did not cause any drugs to enter his blood stream, and did not cause his death"; and

- That Maldonado's cause of death was "respiratory arrest and cardiac arrest" resulting from "Taser use" and restraints applied to his person.

(Defs' 56.1 ¶ 306; Pl's 56.1 ¶ 306; *see also* 2018 Report at 7.)  He relied on several subsidiary

assumptions to reach those opinions.  First, Dr. Baden claimed that an autopsy and toxicology

results cannot control for drug tolerance.  (2018 Report at 5.)  In other words, the drug levels in

Maldonado's blood may be fatal to individuals with low tolerance but not to "an addict who has

developed a high tolerance level."  (*Id.* at 5–6; *see also* Troetti Decl., Ex. FFF ("Baden Dep.") at

242:24–243:25 (Dkt. No. 226-58) (agreeing that 44 ng/mm—the measure of fentanyl in

Maldonado's blood sample—could have caused Maldonado's death "if he was not tolerant to

it").)  Second, he asserted that Maldonado had a "very high tolerance" to opiates because he did

not show typical signs of overdose such as "slurred speech" or "cyanotic lips" and because he

"did not respond" to multiple doses of NARCAN.  (2018 Report at 6; *see also* Baden Dep. at

247:10–24.)  Moreover, Maldonado had taken drugs before his death as evidenced by a urine test

that was positive for marijuana and the package of Suboxone found in the room Maldonado

shared with his brother.  (*See* McLaughlin Decl., Ex. 60 ("2023 Report") at 2–3 (Dkt. No. 235-

60); *see also* Troetti Decl. Ex. A ("Rabadi Medical Records") at 1 (Dkt. No. 226-1).)  Third,

23

Dr. Baden asserted that Maldonado "had no opportunity to take [] drugs while he was being followed from Best Buy," (2018 Report at 6), that he was "alert" and "able to run" prior to interacting with Defendants, (Baden Dep. at 247:10–24), and noted that Maldonado "lost consciousness rapidly while being restrained . . . and immediately after he was tased," (2018 Report at 6). Finally, he explained that loss of consciousness was consistent with asphyxia and with an "electroconvulsive discharge," which can lead to cardiac arrhythmia and ultimately cardiac arrest. (2018 Report at 6–7.)[16]

In developing his report, Dr. Baden reviewed the autopsy and toxicology reports, in addition to the video and deposition evidence discussed in Section I.A. of this Opinion. (*Id*. at 1.) As to how he formed the opinions and conclusions, Dr. Baden stated they were "based on my education, training, and experience as a forensic pathologist and on the [] materials that I have reviewed." (*Id*. at 7.)

Some additional material appears in Dr. Baden's three supplemental reports. His October 2020 report responded to the deposition of Dr. Milanovic—the assigned medical examiner—who concluded that Maldonado died from an overdose. Baden first disputed whether drug molecules could have seeped out of the bags Maldonado placed in his mouth. According to him, "the reason that glassine envelopes are used by drug dealers—as well as by stamp collectors . . .—is because glassine envelopes do not permit moisture seepage." (McLaughlin Decl., Ex. 59 ("2020 Report") at 3 (Dkt. No. 235-59).) He also responded to the suggestion that the taser prongs lodged too far from Maldonado's heart to cause death. Blood, he said, "is a good conductor of

---

[16] Dr. Baden agreed at his deposition that "the combination of the deployment of the Taser and the compression of Mr. Maldonado's diaphragm caused asphyxia and the combination of those two external factors caused his death[.]" (Baden Dep. 323:7–14.) He clarified that he could not "separate out how much [the] Taser and pressure of the back contributed [to Maldonado's death.]" (*Id*. at 323:3–6.)

electricity," which is why a single lightning strike to the back can cause electrical burns in the feet." (*Id*. at 4.)  And Dr. Baden also pointed to a May 2017 warning issued by Taser International about the "risk of serious injury" to individuals "suffering from drug intoxication or chronic drug abuse." (*Id*.)  The March 2023 Report addressed the evidence of Suboxone introduced in 2021 and reiterated his previous conclusion.  (*See generally* 2023 Report.) Dr. Baden discussed several other matters at his deposition, (*see generally* Baden Dep.), but the Parties agree that the considerations and materials cited above formed the "basis" for his cause of death opinions, (*see* Defs' 56.1 ¶¶ 317–21, 330–31; Pl's 56.1 ¶¶ 317–21, 330–31).

### c.  Application

Dr. Baden's testimony falls well short of what Rule 702 requires.  In general, Dr. Baden offers no information about his methodology for making cause-of-death determinations.  Other than listing the evidence he relied on and providing some conclusions about that evidence, Dr. Baden presents only "the formulaic statement" that he formed his opinion "to a reasonable degree of medical certainty, on the basis of my education, training and experience as a forensic pathologist and medical examiner, and on the materials that I have reviewed[.]" *See Bah v. City of New York*, No. 13-CV-6690, 2017 WL 435823, at *11 (S.D.N.Y. Jan. 31, 2017) (reviewing identical language).  (*See also* 2018 Report at 7.)  Absent is any statement of *what* his approach was, whether it could be tested, or whether it was generally accepted in the field of forensic pathology.  *Est. of Jaquez v. City of New York*, 104 F. Supp. 3d 414, 427, 431 (S.D.N.Y. 2015) (quoting *Daubert*, 509 U.S. at 592–93) (listing indicia of reliability and excluding opinion of expert who "advance[d] no methodology to support his conclusions").  Plaintiff characterizes Dr. Baden's reports as applying a totality-of-the circumstances methodology—something Dr. Baden does not say—but the cited caselaw underscores the reports' deficiencies.  (*See* Pl's Mem. 4 (citing *United States v. Zolot*, 968 F. Supp. 2d 411, 419 (D. Mass. 2013).)  In *United*

*States v. Zolot*, the court found Dr. Baden's cause-of-death opinion admissible because he used a particular method of analyzing "postmortem blood samples" and relied on the so-called "bible of toxicologists" in forming his opinion about a lethal drug dose—features entirely absent from his testimony here. *See* 968 F. Supp. 2d at 420–21.[17]  The need for a satisfactory methodology, moreover, "does not change" based on Dr. Baden's "general experience as a forensic pathologist," *see Glowczenski v. Taser Int'l, Inc.*, No. 04-CV-4052, 2012 WL 976050, at *8 (E.D.N.Y. Mar. 22, 2012) (excluding opinion of forensic pathologist that death was caused by asphyxia from Taser discharge); "[w]hen an expert opinion is based on [] a methodology, or studies that are simply inadequate . . . *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony," *United States v. King*, 634 F. Supp. 3d 76, 82 (S.D.N.Y. 2022) (quoting *Amorgianos*, 303 F.3d at 266).

And those deficiencies permeate Dr. Baden's findings.  First, Dr. Baden offers no method that would allow him to conclude that the Taser had anything to do with Maldonado's passing. At bottom, he appears to rely on the temporal proximity between the tasings and Maldonado's becoming unconscious, coupled with product warnings associated with the Taser.  (*See generally* 2018 Report; *see* 2020 Report at 4.)  The caselaw rejects the former.  *See Oliver v. City of Orlando*, No. 06-CV-1671, 2011 WL 2174010, at *7–8  (W.D. La. May 31, 2011) (collecting cases where courts rejected experts opining about the causal link between tasers and death based solely on temporal proximity); *see also Oliver v. City of Orlando*, No. 06-CV-1671, 2011 WL 2174010, at *7 (M.D. Fla. May 31, 2011) (finding causation opinion unreliable where expert

---

[17] The same is true of other cases admitting Dr. Baden's testimony.  *Godinez v. City of Chicago*, No. 16-CV-7344, 2019 WL 5290901, at *2 (N.D. Ill. Oct. 18, 2019) (admitted testimony where Dr. Baden relied on multiple studies to support his specific interpretation of toxicology data).

"appeared to focus on the temporal proximity between when [the decedent] was tased and his death" as opposed to "alternative explanations" like drug usage), *aff'd sub nom. Oliver v. Orange County*, 456 F. App'x 815 (11th Cir. 2012). *Daubert* rejects the latter, because a product warning is hardly a scientific method for opining that the use of the Taser here caused Maldonado's death. *See Martins v. Sherwin-Williams Co*., No. 22-CV-3520, 2023 WL 8788942, at *3 (E.D.N.Y. Dec. 19, 2023) (explaining that expert must have some "formal education or training" to testify on the information that goes into a product label); *cf. Coleson v. Janssen Pharm., Inc*., 251 F. Supp. 3d 716, 723 (S.D.N.Y. 2017) (explaining, in the prescription drug context, that a product label is not necessarily probative of causation because they "can have over-inclusive information on them"). Second, Dr. Baden himself appears to retreat from that opinion in his declaration and deposition testimony. Starting with the declaration submitted in opposition to this Motion, Dr. Baden notably does *not* say that the cause of death was Defendants' use of a Taser—instead, he states, more generally, that it was "the manner in which [Maldonado] was restrained by police." (*See* McLaughlin Decl., Ex. 62 ("Baden Decl.") 3 (Dkt. No. 235-62).) That new framing undermines, or at least contradicts, any prior conclusion that it was the *combination* of Defendants' restraint and Taser use that caused Maldonado's death. Turning to his deposition, Dr. Baden references only one study—not specifically cited in his report—to support his methodology. (*See* Baden Dep. at 170: 3–15, 172:12–15.)[18] Yet that study's causation finding turned on five circumstances, including that the "TASER shock(s) with 1 or both chest barbs near the heart (required for cardiac capture)" and "no other plausible alternative explanation" such as "underlying heart disease/drugs"—circumstances which do not

---

[18] Plaintiff claims that Dr. Baden relied on "many [other] studies," too, (*see* Pl's Mem. 10), but cites no testimony to that effect.

necessarily obtain here. (Defs' Mem. 11–12 (quoting Douglas P. Zipes, *TASER Electronic Control Devices Can Cause Cardiac Arrest in Humans*, 129 *Circulation* 1, 101–11 (2014)).) *See Daniels-Feasel v. Forest Pharms., Inc.*, No. 17 CV 4188-LTS-JLC, 2021 WL 4037820, at *4 (S.D.N.Y. Sept. 3, 2021) ("When an expert relies on the studies of others, he must not exceed the limitations the authors themselves place on the study." (alteration adopted) (quotation marks omitted)), *aff'd*, No. 22-146, 2023 WL 4837521 (2d Cir. July 28, 2023). Accordingly, because Dr. Baden "has furnished no particular methodology in reaching his conclusion," his cause-of-death opinions must be excluded on that basis alone. *See Giles v. Rhodes*, No. 94-CV-6385, 2000 WL 1425046, at *21 (S.D.N.Y. Sept. 27, 2000) (excluding injury-causation opinion of medical examiner); *see also Tolentino v. City of Yonkers*, No. 15-CV-5894, 2017 WL 4402570, at *4 (S.D.N.Y. Oct. 2, 2017) (excluding testimony of forensic pathologist who "described his methodology as relying on his 'general knowledge' and 'practical experience'").

Even assuming Dr. Baden outlined his methods, his opinions also lack an adequate foundation. Instead of "facts" or "data," he relies on a series of assumptions and inferences that goes something like this: (1) the concededly lethal fentanyl present in Maldonado's blood would not be lethal to an individual with high tolerance; (2) Maldonado had such a tolerance; and (3) the circumstances of death are consistent with an alternative explanation. Where, as here, an expert relies on several layered assumptions, "it is critical that [the] experts' analysis be reliable at every step." *See Hill v. Quigley*, 336 F. Supp. 3d 283, 299 (S.D.N.Y. 2018) (quoting *Amorgianos*, 303 F.3d at 267), *aff'd*, 784 F. App'x 16 (2d Cir. 2019) (summary order). Indeed, "'any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible' in its entirety." *Id.*; *see also In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 982 F.3d 113, 123 (2d Cir. 2020) (same). Dr. Baden, however, does

not offer scientific or factual support for any of those steps—and in fact does not cite any scientific authority at all.  For instance, nothing is offered to demonstrate that "high-tolerance" individuals are actually resistant to otherwise-lethal doses of fentanyl; the same for the assumption that the absence of certain overdose symptoms, or nonresponsiveness to Narcan, is evidence of high tolerance.  And the only other support for Maldonado having a "very high" tolerance—or that he ever even consumed opiates—is speculation based on the presence of Suboxone in Maldonado's room, without any evidence about whether Maldonado ever used Suboxone, how often or even when he might have done so.  Similarly, Dr. Baden's opinion that the Taser and restraint combination caused Maldonado's death turns on the temporal proximity of those events and Dr. Baden's statements about potential effects of Taser use.  (*See* 2018 Report at 7.)  Yet, Plaintiff concedes that Dr. Baden "is not an expert in Tasers" and does not point to any "existing data" to support his conclusions.  (Pl's Mem. 8; *see also* Baden Dep. at 54:16–18 ("I am not an expert on the electrical aspects of tasering.").)  This concession certainly justifies precluding Dr. Baden's conclusion regarding the causal link between the use of Tasers and Maldonado's demise.  *See Ambler v. Nissen*, No. 20-CV-1068, 2023 WL 4612016, at *3 (W.D. Tex. July 18, 2023) ("The Court . . . finds that Baden is not qualified to testify on the physiological effect of a Taser.  By his own admission, Baden is not an expert on Taser devices, and [p]laintiffs offer no evidence that he has any education, training, or experience in electricity or its effects."); *Rascon v. Brookins*, No. 14-749, 2018 WL 739696, at *6 (D. Ariz. Feb. 7, 2018) ("The Court has reviewed Dr. Baden's CV and finds that he is not qualified to offer testimony regarding police policy or TASER use.").

A few other points are worth addressing as well:  (1) the idea that Maldonado must not have overdosed because he did not exhibit signs of an overdose in front of the Best Buy

29

employees; (2) that the contents of the glassine bags did not enter Maldonado's system; and (3) that the ineffectiveness of Narcan demonstrates Maldonado's drug tolerance. The first point cuts the other way and simultaneously undercuts Dr. Baden's second point, as the absence of overdose signs *prior* to ingesting the glassine bags suggests that contents of those bags triggered what came after. The second point is also undercut by both the physical evidence that the "tan resdue" inside the baggies contained fentanyl, (*see* Defs' 56.1 ¶¶ 283–84; Pl's 56.1 ¶¶ 283–84) and the proximity between when Maldonado swallowed the baggies and his immediate signs of suffering from an overdose. The third point lacks support entirely—from literature, studies, experience, or anything else. Indeed, the only thing bridging these analytical gaps is Dr. Baden's say-so, in other words: "classic ipse dixit." *See Est. of Jaquez*, 104 F. Supp. 3d at 431 (emphasis omitted). This limitation has led other courts to preclude similar testimony from Dr. Baden. *See, e.g., Rascon*, 2018 WL 739696, at *6 ("The Court is unable to evaluate whether Dr. Baden's opinions are reliable because he does not include any reference to peer reviewed publications or any objective evidence to support his conclusions."). This is not a situation where Dr. Baden would be "helpful" to a jury. In fact, "all three of [Dr. Baden's] conclusions could reasonably be drawn by [a] jury based on the undisputed evidence . . . and a lay person's limited knowledge of [Tasers]." *See Bah*, 2017 WL 435823, at *11.

The Court considers one final point that can often cause confusion. Plaintiff points to Second Circuit precedent that the "lack of textual authority for [an expert's] opinion[] goes to the weight, not the admissibility, of his testimony," to make up for Dr. Baden's lack of citation (Pl's Mem. 7 (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995).) That general principle is accurate, and an expert certainly need not "back his or her opinion with published studies that unequivocally support his or her conclusions." *Amorgianos*, 303 F.3d at

266 (quotation marks omitted). The Second Circuit has even affirmed admission of an expert who "could not point to a single piece of medical literature" to support his opinions. *See McCullock*, 61 F.3d at 1043; *see also Joiner*, 522 U.S. at 146 ("Trained experts commonly extrapolate from existing data."). However, Plaintiff leaves out an important caveat that lack of textual support "may go to weight" "where an expert *otherwise reliably utilizes scientific methods* to reach a conclusion." *In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 982 F.3d at 123 (quoting *Amorgianos*, 303 F.3d at 267). In cases like this one where, an expert does not "'reliably utilize[] scientific methods,' and the conclusions [are] not supported by other studies, the expert['s] reports are properly excluded." *Id*.

Accordingly, the Court excludes Dr. Baden's opinions regarding the cause of Maldonado's death.

### 2. Deliberate Indifference

Defendants also seek summary judgment on Plaintiff's claim that Defendants failed to provide adequate medical care in violation of the Fourteenth Amendment. Specifically, they argue, as a matter of law, that Defendants did not violate Maldonado's rights, (Defs Mem. 15–18), and alternatively that they are entitled to qualified immunity, (*id*. at 18–20).

### a. Legal Framework

To establish a deliberate-indifference claim under the Fourteenth Amendment's Due Process Clause—which applies to pre-trial detainees—a plaintiff must establish: "(1) that the 'deprivation of medical care was sufficiently serious,' and (2) that the defendant 'acted or failed to act with 'a sufficiently culpable state of mind.'" *Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 395 (S.D.N.Y. 2020) (alterations adopted) (quotation marks omitted) (quoting *Smith v. Outlaw*, No. 15-CV-9961, 2017 WL 4417699, at *2 (S.D.N.Y. Sept. 30, 2017)); *accord Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The first element calls for evidence that the

detainee "was actually deprived of adequate medical care" and that the deprivation was

"sufficiently serious," i.e., that it gave rise to "an unreasonable risk of serious damage to [the

detainee's] health." *Pateman v. City of White Plains*, No. 17-CV-6156, 2020 WL 1497054, at

*20 (S.D.N.Y. Mar. 25, 2020) (alterations adopted) (quotation marks omitted) (quoting

*Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006), then *Walker v. Schult*, 717 F.3d 119,

125 (2d Cir. 2013)).[19]  "There is no static test to determine whether a deprivation is sufficiently

serious; instead, the conditions themselves must be evaluated in light of contemporary standards

of decency." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (citation and quotation marks

omitted).  However, the situation usually must be "a 'condition of urgency' that may result in

'degeneration' or 'extreme pain.'" *Grimmett v. Corizon Med. Assocs. of N.Y.*, No. 15-CV-7351,

2017 WL 2274485, at *3 (S.D.N.Y. May 24, 2017) (quoting *Chance v. Armstrong*, 143 F.3d 698,

702 (2d Cir. 1998)).

The second element asks, objectively, whether the law enforcement officer "acted

intentionally to impose the alleged condition" or "recklessly failed to act with reasonable care to

mitigate the risk that the condition posed to the pretrial detainee even though the defendant-

official knew, or should have known, that the condition posed an excessive risk to health or

safety." *Darnell*, 849 F.3d at 35 (explaining that, "[i]n other words, the 'subjective prong' (or

---

[19] Defendants argue that there is no "constitutional right to first aid from police officers at the scene of an accident." (*See* Defs' Mem. 17 (quoting *Mueller v. County of Westchester*, 943 F. Supp. 357, 359 (S.D.N.Y. 1996), *aff'd*, 122 F.3d 1056 (2d Cir. 1997)).)  While accurate, that statement has nothing to do with the facts or claims in this case.  Unlike officers who happen upon an accident, Defendants detained Maldonado and therefore took on an obligation to, at minimum, not be deliberately indifferent to Maldonado's serious medical needs.  *See Maldonado*, 460 F. Supp. 3d at 393 (stating the "alleged circumstances"—now confirmed by the record—"are a far cry from the facts of the cases . . . [where] detainment was for medical purposes only"); *see also Cruz v. City of New Rochelle*, No. 13-CV-7432, 2017 WL 1402122, at *28 (S.D.N.Y. Apr. 3, 2017) (discussing the Fourteenth Amendment obligations of arresting officers).

'mens rea prong') of a[n Eighth Amendment] deliberate indifference claim is defined objectively" (italics omitted)); *see also Howard v. Brown*, No. 15-CV-9930, 2018 WL 3611986, at *4 (S.D.N.Y. July 26, 2018) (noting this element is applied "differently to claims under the Eighth Amendment and the Fourteenth Amendment"). "[A]ny [Section] 1983 claim for a violation of due process[, however,] requires proof of a mens rea greater than mere negligence." *Smith*, 2017 WL 4417699, at *3 (quoting *Darnell*, 849 F.3d at 36) (italics omitted); *see also Dumel v. Westchester County*, 656 F. Supp. 3d 454, 465 (S.D.N.Y. 2023) (same). Courts routinely have held, relying on Eighth Amendment caselaw, that "[t]he same standards apply to a claim of deliberate indifference to serious medical needs on the part of nonmedical prison personnel" as apply to medical personnel. *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *13 (S.D.N.Y. Mar. 30, 2017) (quoting *Hodge v. Coughlin*, No. 92-CV-622, 1994 WL 519902, at *11 (S.D.N.Y. Sept. 22, 1994), *aff'd*, 52 F.3d 310 (2d Cir. 1995)).

Additionally, where a plaintiff's claim is "based on temporary delay or interruption in treatment, the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the [detainee]." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003) (citations and footnote omitted). "[It is] the particular risk of harm faced by a [detainee] due to the challenged deprivation of care, rather than the severity of the [detainee's] underlying medical condition, considered in the abstract, that is relevant . . . ." *Id.* (citations omitted). "[A]lthough a delay in providing necessary medical care may in some cases constitute deliberate indifference, the Second Circuit has reserved such a classification for cases in which, for example, officials ignored a life-threatening and fast-degenerating condition for three days, or delayed major surgery over two years." *Jones v. Westchester County*, 182 F. Supp. 3d 134, 155 (S.D.N.Y. 2016) (citation, alteration, and quotation marks omitted); *see also Dunham v. City of*

*New York*, No. 11-CV-1223, 2021 WL 918373, at *10 (S.D.N.Y. Mar. 10, 2021) ("Only 'a significant delay in medical treatment' provided to an injured arrestee may 'ris[e] to the level of constitutional injury.'" (alteration in original) (quoting *Ricks v. O'Hanlon*, No. 07-CV-9849, 2010 WL 245550, at *8 (S.D.N.Y. Jan. 19, 2010)).

### b.  Application

Plaintiff's claims center on alleged delays in life-saving medical treatment.  (*See* Pl's Mem. 12.)  In particular, Plaintiff points to:  Freeman's decision not to "rush[]" Maldonado "to medical treatment immediately"; and "unnecessary delays in providing potentially life[-]saving treatments" and related failure to "take certain basic steps to assist Mr. Maldonado" after noticing he was unconscious.  (*Id.*)  Defendants acknowledge that Maldonado's condition was sufficiently severe—indeed, life-threatening—but dispute whether they deprived Maldonado of care and whether any deprivation constituted deliberate indifference.  (*See* Defs' Mem. 15–17.)[20] The Court agrees with Defendants and concludes that Plaintiff's claim fails under both prongs of the Due Process-based test.

First, the record, which largely consists of indisputable video and audio recordings, even when viewed in the light most favorable to Plaintiff, does not demonstrate a serious delay in the provision of medical care.  Indeed, Defendants responded almost immediately after noticing that Maldonado was non-responsive and may have overdosed.  (*See* Defs' 56.1 ¶¶ 198–200; Pl's 56.1

---

[20] Plaintiff suggests that Defendants "do not appear to be challenging the first prong of the deliberate indifference claim."  (Pl's Mem. 11.)  But this is not entirely accurate.  While Defendants do not challenge the seriousness of Maldonado's *condition*, they very much dispute whether any delay in treatment constituted a *deprivation*.  *See Salahuddin*, 467 F.3d at 279 (explaining that the first deliberate indifference element involves an inquiry into "whether the [detainee] was actually deprived of adequate medical care.")  Indeed, their argument depends on Freeman "promptly summoning an ambulance and personally administering various forms of medical assistance."  (Defs' Mem. 17.)

¶¶ 198–200.)  Defendants called for an ambulance within minutes.  (*See* Defs' 56.1 ¶¶ 169–79; Pl's 56.1 ¶¶ 169–79 (no dispute that the initial 911 call occurred at 5:48:25 and Lara requested an ambulance at roughly 5:53:37).)  Roughly two minutes after the initial dose of Narcan, Freeman noticed that "Maldonado's respiration did not improve" and recommended he be placed on breathing assistance.  (Defs' 56.1 ¶¶ 207–10; Pl's 56.1 ¶¶ 207–10.)  The Parties agree that an EMT was on the scene by 5:56:41, (Defs' 56.1 ¶ 202; Pl's 56.1 ¶ 202), that Freeman ran Maldonado to an ambulance at 6:00:06, (Defs' 56.1 ¶ 225; Pl's 56.1 ¶ 225), that Maldonado received "advanced airway treatment" and CPR in the ambulance, (Defs' 56.1 ¶ 242, Pl's 56.1 ¶ 242), and that he came under the care of an ER physician at White Plains Hospital at 6:23, (Defs' 56.1 ¶¶ 250–52; Pl's 56.1 ¶¶ 250–52).  All told, Defendants began to administer treatment within minutes after noticing Maldonado was unresponsive, at most six minutes elapsed from the 911 call (which precedes the onset of Plaintiff's condition) and the request for an ambulance, and at most 36 minutes passed between the call and Maldonado's arrival at an ER.

In light of that indisputably prompt response, Plaintiff's claims of delay, to the extent there was any, come down to a matter of minutes if not seconds.  For example, the most tangible claim—that Freeman opted to try a second Narcan dose instead of immediately taking Maldonado to the hospital—appears to involve a time period of one minute and thirteen seconds. (*See* Pl's Mem. 12 (citing Pl's 56.1 ¶ 385 (recounting conversation between Freeman and Thompson from 5:57:37 to 5:58:50)).)  And other purported lapses either involve a similar timeframe or lack specificity.  (*See id.*) [21]  The Court, of course, must consider that alleged

---

[21] Plaintiff's Opposition never actually articulates how long Maldonado's treatment was delayed.  (*See generally* Pl's Mem.)  It instead relies on statements like "there were unnecessary delays in potentially lifesaving treatments . . ." or "Freeman's delay or hesitation in treatment was part of the cover-up conducted by the individual Defendants."  (Pl's Mem. 12.)  Although the Court assumes that Plaintiff did provide a specific timeframe, such conclusory statements are

deprivation "in relation to the specific factual context of [this] case," particularly Maldonado's life-threatening condition. But the seriousness of a condition is not dispositive. Where a claim is based on a delay in "otherwise adequate treatment," the Second Circuit has instructed courts to "focus on the challenged *delay* . . . rather than the [detainee's] *underlying medical condition* alone." *Smith*, 316 F.3d at 185 (emphasis in original); *see also McTootle v. Genovese*, No. 12-CV-3526, 2013 WL 5419440, at *3 (S.D.N.Y. Sept. 27, 2013) ("Th[e] seriousness inquiry . . . is significantly narrower in cases where the inadequacy is in the medical treatment given as opposed to those cases where the allegation is solely a complete *denial* of medical care." (emphasis in original) (quotation marks and citation omitted)). Plaintiff does not present evidence that the alleged delay posed a "particular risk" to Maldonado or that it materially "worsened [his] medical condition," *see Smith*, 316 F.3d at 185 (quotation marks omitted), especially since Maldonado received the treatments Plaintiff alleges were denied. In light of Defendants' otherwise prompt and adequate actions, which again is indisputable given the nature of the evidence in this case, any delay is not sufficiently "serious" to give rise to liability. *See Rodriguez v. New York City*, No. 19-CV-1526, 2019 WL 13393543, at *2 (E.D.N.Y. July 10, 2019) ("[T]he Second Circuit has reserved the deliberate-indifference classification for cases in which, for example, officials . . . ignored a life-threatening and fast-degenerating condition for three days[.]" (quotation marks omitted)); *see also Ridge*, 2022 WL 357020, at *14 (granting summary judgment to defendant where plaintiff, who "required emergency treatment," "received

---

insufficient to oppose summary judgment. *Ridge v. Davis*, No. 18-CV-8958, 2022 WL 357020, at *15 (S.D.N.Y. Feb. 7, 2022) (granting summary judgment to defendant on deliberate indifference claim where plaintiff relied on "conclusory assertions" like "[defendant] mad[e] [plaintiff] wait unreasonably for medical assistance" (quotation marks omitted)); *see also Robinson v. Concentra Health Servs., Inc*., 781 F.3d 42, 44 (2d Cir. 2015) (noting "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" to defeat summary judgment (quotation marks omitted)).

care almost immediately" and saw a medic in "less than ten minutes"); *Fuentes v. Balcer*, No. 10-CV-684, 2013 WL 276679, at *8 (S.D.N.Y. Jan. 24, 2013) (finding that medical care was provided within approximately one hour and ten minutes and thus was within the category of "temporary delay" that courts have "generally recognized as insufficient to support a deliberate indifference claim" (citation and quotation marks omitted)).

That conclusion, to be clear, is based on the circumstances of this case, not "[t]he notion that there is a bright line separating short delays from longer delays." *See Allen v. N.Y.C. Dep't of Corr.*, No. 06-CV-7205, 2010 WL 1644943, at *13 (S.D.N.Y. Mar. 17, 2010), *report and recommendation adopted*, 2010 WL 1631404 (S.D.N.Y. Apr. 19, 2010) (denying summary judgment on deliberate indifference claim regarding thirty-five-minute delay in treatment for collapsed lung). It is possible to conceive of a case where the need for care so imminent and obvious that even a brief lapse of time may give rise to liability. But in this case, Plaintiff does not point to any evidence that Plaintiff's condition "required any more immediate attention" than Defendants' indisputably quick response. *See Pateman*, 2020 WL 1497054, at *21.

Second, Plaintiff similarly fails to raise a dispute regarding the mens rea prong. Although Defendants knew Maldonado was unconscious and later that he could not breathe, Defendants did not ignore those conditions or any other "*excessive* risk of which [they] were aware, or should have been aware." *Id.* at *22 (emphasis in original). Indeed, undisputed facts demonstrate that they responded to each one. (*See, e.g.*, Pl's 56.1 ¶¶ 208–209, 239, 241 (citing Freeman's testimony that Maldonado's respiration did not improve, his statement at 5:59:51 that "we are going to BVM and intubate, everything" and the fact that "Freeman immediately intubated [] Maldonado" in the ambulance after the glassine envelopes were removed from this mouth).) Plaintiff instead appears to challenge the sequence of treatment, or *how* Defendants

responded—like the decision to use a second dose of Narcan prior to intubation. (*See* Pl's Mem. 12.) Yet, Plaintiff does not identify what about those decisions was reckless or even unreasonable. For instance, Plaintiff claims Defendants should have known that Narcan "was not working" because it usually "has an immediate ameliorative effect." (*See id*.) However, Plaintiff offers no evidence that Narcan actually acts immediately, rather than after a slight delay, making Defendants wrong to wait before trying alternate measures. (*See* Pl's 56.1 ¶ 207 (not disputing Freeman's testimony that Narcan takes up to one minute to work).) In any event, that in-the-moment decision about the proper course of treatment "is a classic example of a matter for medical judgment," *Bernel v. Korobkova*, No. 21-CV-5106, 2023 WL 6146600, at *7 (S.D.N.Y. Sept. 19, 2023) (quotation marks omitted), not something that gives rise to Fourteenth Amendment liability, *see Charles*, 925 F.3d at 87; *Tutora v. Correct Care Sols., LLC*, No. 17-CV-9169, 2019 WL 1383646, at *5–6 (S.D.N.Y. Mar. 27, 2019) (noting that "the ultimate decision of whether or not to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference"). Even if that were an arguable decision, Defendants would still be entitled to qualified immunity, "as it cannot be said that every reasonable official would disagree with their medical decisions and their belief that those decisions would not violate Plaintiff's rights." *See Davidson v. Lee*, No. 17-CV-9820, 2021 WL 5054118, at *14 (S.D.N.Y. Nov. 1, 2021). Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim that they were deliberately indifferent to Maldonado's medical needs.[22]

---

[22] For the same reason, Attalienti is not liable to the extent he supervised the other Defendant officers during this period. (*See* Pl's Mem. 20–21.) "For a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation." *Est. of M.D. by DeCosmo v. New York*, 241 F. Supp. 3d 413, 429 (S.D.N.Y. 2017) (quoting *Blyden v. Mancusi*, 186 F.3d 252, 265 (2d Cir. 1999)); *see also Clarke v. Sweeney*, 312 F. Supp. 2d 277,

3.  Excessive Force

Defendants next move for summary judgment on the excessive force claims against Lara. (Defs' Mem. 18–22.)  Here, too, they argue that qualified immunity applies.  (*See id*.) Assuming, without deciding, that Lara used unreasonable force, the Court concludes that he did not violate Maldonado's clearly established rights.

The Second Circuit outlined those rights, with respect to Tasers, in *Jones v. Treubig*, 963 F.3d 214, 236 (2d Cir. 2020).  To start, in *Jones*, the Second Circuit held "beyond a doubt," that the use of a taser constitutes "significant force."  *Jones*, 963 F.3d at 226 (citing *Abbott v. Sangamon County*, 705 F.3d 706, 726 (7th Cir. 2013) (noting taser use falls "in the middle of the nonlethal-force spectrum")).  Next, the Second Circuit explained that "[a] critical fact for purposes of qualified immunity . . . is whether the [suspect] was resisting arrest in any way at the time of [a] tasing."  *Id*. at 228.  On the one hand, it has been "clearly established" in the Second Circuit, "before April 2015 that 'officers may not use a [T]aser against a compliant or non-threatening suspect.'"  *Id*. at 227 (quoting *Muschette on Behalf of A.M. v. Gionfriddo*, 910 F.3d 65, 69 (2d Cir. 2018)); *see also Soto v. Gaudett*, 862 F.3d 148, 158 (2d Cir. 2017) ("Though the use of force may be reasonable against a suspect who is fleeing, it may be objectively unreasonable against that suspect when he has been stopped and no longer poses a risk of flight."); *Garcia*, 43 F.Supp.3d at 297 ("[I]t [is] a Fourth Amendment violation to use 'significant' force against arrestees who no longer actively resisted arrest or posed a threat to

---

298 (D. Conn. 2004) ("[O]ne of the requirements of supervisory liability . . . is that the supervisor's action (or inaction) must have led to a deprivation of constitutional rights.").  As explained supra, there was no violation of Maldonado's rights in the course of his medical treatment.  Accordingly, there can be no liability for Attalienti to the extent the other Defendants were under his control.  *See Elek v. Inc. Vill. of Monroe*, 815 F.Supp.2d 801, 808 (S.D.N.Y. 2011) ("Absent an underlying constitutional violation, there is no cognizable claim for supervisor liability." (internal quotation marks omitted)).

officer safety." (second alteration in original)).  On the other hand, "no clearly established law []

would fairly warn police officers that a [T]aser could not be used against a resisting arrestee."

*Jones*, 963 F.3d at 228.  In fact, "[Second Circuit] precedents suggest that it is *not* excessive

force to deploy [T]asers, after a warning, against arrestees who are dangerous or resisting

arrest."  *See id.* (emphasis in original) (quoting *Penree by Penree v. City of Utica*, 694 F. App'x

30, 33 (2d Cir. 2017) (summary order), and citing, inter alia, *MacLeod v. Town of Brattleboro*,

548 F. App'x 6, 8 (2d Cir. 2013) (summary order) (concluding that use of taser "to subdue an

actively non-compliant suspect . . . who posed a real and imminent threat to the safety of the

officers and any bystanders" was objectively reasonable after repeated commands)).

Plaintiff relies on the same body of law in opposing summary judgment.  (*See* Pl's Mem.

17 (citing *Tracy v. Freshwater*, 623 F.3d 90, 98–99 (2d Cir. 2010) (stating Tasers "should not be

used lightly or gratuitously against an arrestee who is complying with police commands or

otherwise poses no immediate threat to the arresting officer.")).)  Accordingly, the Court

examines whether that law would "fairly warn police officers that a [T]aser could not be used"

in the specific context of this case.  *See Jones*, 963 F.3d at 228.

Viewed in the light most favorable to Plaintiff, key facts differentiate this case from the

*Jones* and related caselaw.  Most important is Lara's belief that Maldonado had swallowed

drugs.  The facts giving rise to that belief, some captured on video and audio recordings, are

undisputed.  To start, when Maguire arrived at the scene, Ramos told him repeatedly that

Maldonado "threw something in his mouth" and may have "swallowed something."  (Defs' 56.1

¶ 111; Pl's 56.1 ¶ 111; Ramos Dep. at 63:4–64:7.)  Lara arrived soon after and saw Maguire

struggling with Maldonado on the ground and observed Maguire and Freeman try remove

Maldonado's arms from under him.  (Defs' 56.1 ¶¶ 110, 115, 117; Pl's 56.1 ¶¶ 110, 115, 117.)[23]

Lara then heard Maguire scream "spit it out" at least twice.  (Defs' 56.1 ¶¶ 111, 125–26; Pl's

56.1 ¶¶ 111, 125–26; *see also* Ramos Dep. 64:14-22 (indicating Maguire repeated that command

more than three times).)  Lara testified that he initially holstered his taser, (Lara Dep. 58:8–14),

but that Maguire's repeated commands raised concerns because they meant that Maldonado put

something in his mouth, and that, in his experience, the "something" referred to drugs, (*see id.* at

69:19–70:25.)

　　　While the reasonableness of an officer's view of the facts is usually a jury question, the

Court decides "objective reasonableness" as a matter of law" if there are no material facts in

dispute.  *Green v. City of New York*, 465 F.3d 65, 83 (2d Cir. 2006).  Plaintiff does challenge

Lara's belief, claiming that Lara's concern "is belied by his description of the pat down of . . .

Maldonado . . . ."  (*See* Pl's 56.1 ¶ 131).  Plaintiff does not, however, raise fact disputes

regarding the reasonableness of that belief, (*id.*), or even mention it in Opposition, (*see generally*

Pl's Mem.).  The Court, having independently examined the record, concludes that Lara's belief,

at least that Maldonado swallowed a potentially harmful substance, was objectively reasonable.

To be sure, the basis to believe the substance actually was drugs was not based on personal

observation, but the combination of experience and deduction.  (*See* Lara Dep. at 70:19–20

("What else would [Maguire] be telling him to spit out?  It's just from my experience.").)

Therefore, it was entirely reasonable to believe that the substance *might* have been drugs, or

something else harmful.  (Indeed, why else would Maguire command Maldonado multiple times

---

[23] As discussed infra, disputes of fact remain about what Maldonado was doing at the
time, especially the extent to which he was "resisting" an attempted arrest.  However, the Parties
agree that there was a "physical encounter" with Maguire and that both Maguire and Freeman
attempted to reach and gain control of Maldonado's arms, which he kept under his body.

to "spit it out"?)  There is also no indication that belief was pretextual.  Lara both articulated his

assumption and provided "objective factors"—namely, Maguire's repeated commands—that

"would justify" it.  *See Bryant v. Meriden Police Dep't*, No. 13-CV-449, 2017 WL 1217090, at

*8 (D. Conn. Mar. 31, 2017) (describing how courts analyze perceived threats).[24]

      That belief differentiates this case from the clearly established law Plaintiff cites.

Plaintiff does not provide, and the Court has not found, Second Circuit caselaw addressing a

detainee's rights when officers "use of a [T]aser to prevent [the detainee] from swallowing

contraband," particularly when the detainee is uncooperative.  *See Fuentes v. Schemmer*, No. 18-

CV-8207, 2023 WL 188739, at *7 (S.D.N.Y. Jan. 13, 2023) (addressing the issue as a matter of

first impression).  Nor does Plaintiff identify "a consensus of cases of persuasive authority"

establishing a right not to be tased in that situation.  *See Wilson*, 526 U.S. at 617.  The persuasive

authority, if anything, points to the opposite conclusion.  Starting with this District, the court in

*Fuentes* addressed facts similar to this case:  an arrestee who "repeatedly ignored police

instruction" to "spit out what he had in his mouth," who was observed "struggl[ing] with police"

---

[24] "In assessing the facts on the scene, [Lara] [was] entitled to 'draw on [his] own
experience and specialized training to make inferences from and deductions about the cumulative
information available to [him].'"  *United States v. Belanger*, No. 08-CR-59, 2009 WL 2190377,
at *4 (quoting *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002)).  Courts regularly permit
law enforcement officers to rely on the actions and beliefs of other officers.  For example, in the
probable cause context, "police officers are 'entitled to rely—so long as such reliance is
reasonable—on information provided by other law enforcement officials."  *Dorsey v. Gannon*,
No. 20-CV-1525, 2022 WL 4660555, at *3 (E.D.N.Y. Sept. 30, 2022) (quoting *Hewitt v. City of
New York*, No. 09-CV-214, 2012 WL 4503277, at *4 (E.D.N.Y. Sept. 28, 2012), *aff'd*, 544 F.
App'x 24 (2d Cir. 2013) (summary order).  "[O]fficers must be able to assume that the
information conveyed by their colleagues is accurate and reliable in order for law enforcement to
operate effectively."  *Goodloe v. City of New York*, No. 12-CV-3018, 2017 WL 11683339, at *9
(E.D.N.Y. Mar. 24, 2017) (internal quotation marks and citation omitted).  Here, Lara's belief
that Maldonado had placed drugs in his mouth reasonably relied upon his "own experience and
specialized training" and Maguire's belief in the same, who in turn reasonably relied on
information from others at the scene, (Defs' 56.1 ¶ 111; Pl's 56.1 ¶ 111; Ramos Dep. at 63:4–
64:7).

and "was chewing on something that [the defendant-officer] believed was cocaine[.]"  2023 WL 188739, at *6–7.  The court held that use of a Taser for two-seconds was objectively reasonable both to protect the arrestee from "further harming himself by ingesting the bags of cocaine he was chewing on" and "to bring an unlawful situation to a safe and effective conclusion."  *Id*. at *7 (citing *Love v. Rockford Ill. Mun. Police Dep't*, No. 08-CV-50254, 2013 WL 159246, at *2 (N.D. Ill. Jan. 15, 2013) (holding use of Taser "several times" in similar circumstances reasonable because "[f]ailure to use reasonable force to prevent [the] plaintiff from [swallowing contraband] could very well have resulted in plaintiff harming himself")).  Moving farther afield, the Eleventh Circuit has twice held, albeit in summary orders, that tasing an individual who officers reasonably believed was attempting to swallow contraband did not violate a clearly established right.  *See Sanders v. City of Dothan*, 409 F. App'x 285, 287 (11th Cir. 2011) (per curiam) (affirming grant of qualified immunity where officer tased suspect who had white flakes on his beard and "attempted to swallow something" that turned out to be cocaine); *see also German v. Sosa*, 399 F. App'x 554, 557 (11th Cir. 2010) ("Defendant Sosa did not use excessive force when he attempted to prevent German from swallowing what Sosa believed to be cannabis [and later tased him].").  The Sixth Circuit, in a similar case where the fact of a tasing was disputed, found that qualified immunity would have applied based on similar concerns. *Pennington v. Terry*, 644 F. App'x 533, 546 (6th Cir. 2016) (recognizing the "legitimate government interests" of "preventing a potential drug overdose and preserving evidence").  And many other courts have upheld the use of similar force, "including Tasers and mace, to prevent the destruction of evidence."  *See id*. (collecting cases); *see also Morris v. Tulsa Police Dep't*, No. 09-CV-797, 2011 WL 1542920, at *5 (N.D. Okla. Apr. 21, 2011) (upholding the use of a Taser where the plaintiff ingested cocaine in an attempt to destroy evidence and fought with

police officers); *Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 313–15 (S.D.N.Y. 1998)

(finding a discharge of pepper spray reasonable to induce an arrestee to spit out contraband).

Accordingly, the Court cannot say that every reasonable officer would have known that it was

excessive force to tase an individual believed to have swallowed a harmful substance and who

was actively not cooperating with law enforcement officials.[25]

Plaintiff's arguments against qualified immunity relate to Maldonado's level of

resistance.[26]  According to Plaintiff, a reasonable jury could conclude that Maldonado was not

"actively" resisting when he was tased, and that no reasonable officer would use significant force

justified in that situation.  (*See* Pl's Mem. 17–18.)  Although the Parties agree that Maldonado

resisted, the *degree* of resistance when he was tased is somewhat disputed.  The clearest

---

[25] The Parties briefed Lara's actions as though they constituted a single use of force. However, the Court is mindful of Second Circuit precedent that where "an opportunity to re-assess reasonably exists" between multiple uses of force, "officers must consider whether additional force is necessary under the circumstances."  *Jones*, 963 F.3d at 236 (citing *Tracy*, 623 F.3d at 97–99).  And the Court is aware of other cases where courts have analyzed multiple Taser deployments "independently."  *Scoma v. City of New York*, No. 16-CV-6693, 2021 WL 230295, at *7 (E.D.N.Y. Jan. 22, 2021), *report and recommendation adopted*, 2021 WL 1784385 (E.D.N.Y. May 4, 2021) (evaluating "two taser deployments independently) (citing *Towsley v. Frank*, No. 09-CV-23, 2010 WL 5394837, at *7 (D. Vt. Dec. 28, 2010) (same)).
   For the sake of completeness, the Court notes that Lara's decision to tase Maldonado a second time, in drive-stun mode, does not change this analysis.  (*See* Pl's 56.1 ¶ 120; Lara Dep. at 84:6–10 ("Believing I had a bad hit . . . I came back and followed up with a drive stun").)  To the extent Lara had time to assess whether continued force was appropriate, he did so.  Lara testified that he believed the initial tasing was ineffective, (Lara Dep. at 84:6–10), which led him to discharge the Taser a second time, ultimately allowing Maguire to gain control of Maldonado's arms, (*id*. at 86:3–10).  Plaintiff does not contest any of that testimony or argue that Lara's perceived need to incapacitate Maldonado abated in that timeframe.

[26] Plaintiff briefly references facts about whether Plaintiff was restrained and whether he presented a risk of harm or injury to other officers.  (*See* Pl's Mem. 16.)  While these issues are relevant to the *Graham* objective reasonableness analysis, the precedent Plaintiff cites regarding clearly established law is focused almost entirely on the degree of resistance.  The Court therefore centers its qualified immunity analysis on that issue.

evidence of resistance comes from Russo who testified that Maldonado was initially "going back and forth sideways" and "rotating his shoulders" while on the ground. (Russo Dep. at 93:4–24, 100:5–10.) He also stated that Maldonado was "flailing and squirming" (*id.* at 146:21–23), which is indicative of active resistance. That said, Russo defined "flailing" as something akin to a "seizure," (*id.* at 142:8–9)—which raises an entirely different question about whether Maldonado was resisting. Maguire, for his part, could not recall if Maldonado was "still rocking back and forth" at the time of the first tasing, only that he "wasn't taking his arms out from under his stomach." (*See* Troetti Decl., Ex. UU at 86:13–16 (Dkt. No. 226-47).) Lara described Maldonado's "resistance" as "refusing to pull [his arms] out so we could cuff[] him" and noted that, prior to the tasing, Maldonado appeared to roll to prevent "[Lara] from sticking [his] hand underneath [Maldonado]." (Lara Dep. at 118:20–21.) And Freeman could not "remember the specifics of the [T]aser deployment" other than his attempts to "remove [Maldonado's] arms" from under him. (Freeman Dep. at 50:14–19.) Thus, viewed most favorably to Plaintiff, Maldonado was lying face down on top of his arms, as opposed to rolling or "flailing" when he was tased.

Plaintiff contends that these actions fall short of active resistance and cites out-of-circuit cases where tasing a passively resisting suspect violated clearly established law. (Pl's Mem. 15–16 (citing, inter alia, *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) ("The right to be free from the application of non-trivial force for engaging in mere passive resistance was clearly established [in the Ninth Circuit] prior to 2008.").)[27] The Second Circuit addressed the active/passive resistance distinction in *McKinney*, 49 F.4th 730, where it stated that "the

---

[27] The "non-trivial force" in *Gravelet-Blondin* involved "the discharge of a [T]aser in dart mode." *Gravelet-Blondin*, 728 F.3d at 1091.

police *may* violate clearly established law by *initiating* significant force against a suspect who is only passively resisting." *Id*. at 724 (first emphasis added) (citing *Gravelet-Blondin*, 728 F.3d at 1093). That statement, while not essential to *McKinney*'s holding, contains a "see, e.g." cite to the Ninth Circuit's decision in *Gravelet-Blondin*, implying that a consensus of persuasive authority supports a right to be free from significant force while engaged in passive resistance, without more. *See id.* (citing *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 525 (7th Cir. 2012) (explaining that "willful noncompliance [i]s not the same as active[ ] resist[ance] but instead [is] passive resistance requiring the minimal use of force") (internal quotation marks and emphasis omitted); and *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011) (en banc) (noting the distinction between "failure to facilitate an arrest and active resistance to arrest")).

But even assuming that right was clearly established in the Second Circuit at the time, it is not clear that it applies here. First, "neither the Supreme Court nor the Second Circuit has specifically defined 'active resistance,'" or "passive resistance" in a dispositive manner. *See Scoma*, 2021 WL 230295, at *8, *report and recommendation adopted*, 2021 WL 1784385. And the undisputed facts here differ from Plaintiff's persuasive precedent. For instance, in *Gravelet-Blondin*, the suspect was "perfectly passive, engaged in *no* resistance, and did nothing that could be deemed 'particularly bellicose.'" 728 F.3d at 1092 (emphasis added). In *Matos*, among many other distinctions, there were "no other exigent circumstances" at the time; and the court characterized the relevant resistance—a suspect's act of "stiffen[ing] her body and clutch[ing] her steering wheel"—as a type of "active[] resistance," just not one that supported tasing. 661 F.3d at 446. Finally, *Meyers v. Baltimore County*, 713 F.3d 723 (4th Cir. 2013), appeared to rely on the lack of resistance as much as it did the gratuitousness of force used—seven [T]aser discharges after a suspect was "secured with several officers sitting on his back." *Id*. at 735.

46

Here, there was at least *some* resistance plus an exigent situation created by reports that Maldonado had swallowed something that the Lara reasonably believe was narcotics. That situation provided a justification for force absent from any of the cases cited above.[28] Therefore, because none of this precedent would provide a reasonable officer "fair warning" that the use of a Taser was excessive under the circumstances, *see Terebesi*, 764 F.3d at 230, the Court finds that Lara is entitled to qualified immunity.

### 4. False Statements & Conspiracy

Next, Defendants seek summary judgment on Plaintiff's claim that Attalienti authored a false incident report, (Defs' Mem. 28–30), and the related claim that Defendants conspired to cover up the circumstances surrounding Maldonado's death, (*id*. at 31). The core of Plaintiff's theory is that the Incident Report, which in turn relied on statements from Defendants, omitted facts about Defendants' alleged deliberate indifference. (*See* Pl's Mem. 20–21.) Undisputed, however, is that the report was issued after Maldonado's death. (*See* Defs' Mem. 29–30; Pl's Mem. 20–21; McLaughlin Decl. Ex. 17 ("Incident Rept.") at 5 (report dated December 2, 2017) (Dkt. No. 232-17).)

It a "well established rule" in the Second Circuit "that post-mortem cover-ups are not actionable conspiracies, as a deceased person does not have constitutional rights." *Harrell v. N.Y.S. Dep't of Corr. & Cmty. Supervision*, No. 15-CV-7065, 2019 WL 3817190, at *3

---

[28] These distinctions should not be read to suggest that the cited caselaw is strictly limited to its facts. The Court recognizes, as the Supreme Court has held, that "general statements of the law are not inherently incapable of giving [officers] fair and clear warning" and that rules "already identified in decisional law may apply with obvious clarity to the specific conduct in question, even though the very act in question has not previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741, (2002) (alteration adopted) (internal quotation marks omitted) (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)). Here, however, these factual distinctions are material and prevent "decisions from this or other circuits [from] clearly foreshadow[ing] a particular ruling on the issue" in this case. *See Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014) (internal quotation marks omitted).

(S.D.N.Y. Aug. 14, 2019) (citing *Ford v. Moore*, 237 F.3d 156, 165 (2d Cir. 2001) (explaining that, after death, "[the decedent] had no rights of which he could be deprived" (internal quotation marks and citation omitted)); *see also Infante v. Dignan*, 782 F. Supp. 2d 32, 38 (W.D.N.Y. 2011) (same); *Estate of Morris ex rel. Morris v. Dapolito*, 297 F. Supp. 2d 680, 691 n. 9 (S.D.N.Y. 2004) (same); *Helmer v. Middaugh*, 191 F. Supp. 2d 283 (N.D.N.Y. 2002) (explaining that "a dead man does not have any constitutional rights" and dismissing claims regarding publication of autopsy material after decedent's death); *cf. Ford*, 237 F. 3d at 165 (citing *Silkwood v. Kerr-McGee Corp.*, 637 F.2d 743, 749 (10th Cir. 1980) ("[T]he civil rights of a person cannot be violated once that person has died.")).  The rationale is that "[a]fter death, one is no longer a 'person' within our constitutional and statutory framework" and therefore has no cause of action under Section 1983.  *See Infante*, 782 F. Supp. 2d at 38 (quotation marks omitted); *see also Guyton v. Phillips*, 606 F.2d 248, 250 (9th Cir. 1979) (interpreting Section 1983 and holding that "the term 'person', as used in a legal context, defines a living human being and excludes a corpse or a human being who has died").

The post-mortem-cover-up rule applies here are bars both claims as a matter of law.  All events related to the cover up—i.e., Attalienti's filing of the Incident Report and the omissions therein—occurred days after Maldonado's death.  And although the administratrix of Maldonado's estate brings this Action, the conspiracy claims allege injuries to Maldonado and violations of his constitutional rights, not those of Plaintiff.  (Am. Compl. ¶ 94 ("Defendants conspired together to deny Mr. Maldonado's rights . . . ."); *id*. ¶ 97 ("As a direct and proximate result of said violation, Mr. Maldonado suffered [] injuries and damages . . . .").)  Accordingly, even if Plaintiff could prove that Defendants conspired to make false statements, Maldonado's death "extinguished any claim" based on that conduct.  *See Ford*, 237 F.3d at 165 ("Even if there

were a viable claim against [the defendant] for conduct after [the decedent's] death, the death would have extinguished any claim of [the decedent]."[29]  Further, "whatever post-death claim [] Plaintiff may have in her capacity as administratrix" regarding this conduct "has not been alleged."  *Id*. (citation omitted).  The Court therefore grants summary judgment to Defendants on counts three and four.  (*See* Am. Compl. ¶¶ 93–103.)

III.  Conclusion

For the aforementioned reasons, Defendants' Motion is granted.  The Court will hold a telephonic status conference on October 7, 2024, at 10:00 AM.  The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 225.)

SO ORDERED.

Dated:    September 26, 2024
          White Plains, New York

_____
     KENNETH M. KARAS
     United States District Judge

---

[29] The Court has conducted its own review of the record and Defendants' argument but notes that Plaintiff failed to respond to this argument in its Opposition brief.  (*See generally* Pl's Mem.)